**TEXAS COMMITTEE ON NATURAL RESOURCES and Mrs. Peggy Amerson, Plaintiffs-Appellees,**

v.

**John O. MARSH, Jr., Secretary, Department of the Army, Defendant-Appellant,**

**North Texas Municipal Water District, Sulphur River Municipal Water District and City of Irving, Texas, Intervenors-Appellants.**

**No. 83–2145.**

United States Court of Appeals, Fifth Circuit.

July 16, 1984.

Rehearing Denied Sept. 17, 1984.*

---

\* Order on rehearing is published at 741 F.2d 823. Those portions of the order modifying original opinion are incorporated herein.

Roland Boyd, Bill Boyd, John E. Gay, McKinney, Tex., for North Texas, et al.

William Cornelius, Asst. U.S. Atty., Tyler, Tex., James Spears, Atty., U.S. Dept. of Justice, Washington, D.C., for Marsh, Secty. Army.

Don J. Rorschach, City Atty., Irving, Tex., for City of Irving, Tex.

Edward C. Fritz, Dallas, Tex., Richard A. Shannon, Austin, Tex., for Texas Committee.

Jim Mattox, Atty. Gen., R. Lambert Townsend, Asst. Atty. Gen., Austin, Tex., for amicus State of Tex.

Before TATE, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Army Corps of Engineers appeals an order of the district court permanently enjoining work on its proposed Cooper Lake and Channels project pending submission of an environmental impact statement which complies with the provisions of the National Environmental Policy Act (NEPA). Because we find that the environmental impact statement submitted by the Corps of Engineers in 1981 complies with the requirements of NEPA, we reverse the judgment of the district court and dissolve the injunction.

I.

In 1955 the Army Corps of Engineers secured Congressional approval of a multi-purpose reservoir and flood-control plan for north Texas called the Cooper Lake and Channels Project. Congress authorized the use of federal funds to finance the flood-control aspects of the project, which included the construction and repair of levees and channel clearance along the Sulphur River. The congressional authorization also permitted the Corps to build water-supply facilities for use by communities in the project area if those communities agreed to pay for their construction and maintenance.

Between 1955 and 1967, the Corps completed most of the levee and channel work designed to control flooding in the project area. Then, in 1971, the Corps obtained the funding necessary to begin building Cooper Lake, the proposed reservoir. At that time, the plaintiffs in this case first went to court to block completion of the reservoir, and they obtained a preliminary injunction. Since then, virtually no work has been done toward the completion of the project except for design and the acquisition of land.

## II.

In 1971 the Texas Committee on Natural Resources (TCNR) [1] obtained a preliminary injunction forbidding any work on the Cooper Lake project except design and the acquisition of land pending the promulgation of an environmental impact statement (EIS) by the Corps. The Corps originally took the position that NEPA did not apply to the Cooper Lake project because it was begun prior to the enactment of NEPA. Having lost that particular argument, the Corps prepared a draft EIS and released it for public comment in June 1976. The Corps modified the EIS and the project plans in response to comments from the public, and it released the EIS in June 1977.

TCNR amended its original complaint to allege that the 1977 EIS did not comply with the requirements of NEPA. The Corps responded by moving that the preliminary injunction be lifted. In December 1978, after a trial that lasted several days, the district court issued a thirty-page memorandum opinion in which it set forth the deficiencies it found in the EIS.[2] Concluding that the Corps had not met its obligations under NEPA, the district court issued a permanent injunction against the project pending promulgation of an adequate EIS.

Rather than appeal the district court's ruling, the Corps chose to revise the EIS in response to the criticisms expressed in the

memorandum opinion. A draft of the supplemental EIS (SEIS) was released in October 1980 for public comments, and the final SEIS was published in March 1981.

In July 1981 the Corps moved for the district court to dissolve the permanent injunction. The district court ordered the parties to submit stipulations of fact to supplement the record in the case. Without an evidentiary hearing, the district court issued a second memorandum opinion, exceeding one hundred pages, describing inadequacies in the SEIS. In March 1983, the district court issued a second permanent injunction prohibiting the Corps from "continuing further with the Cooper Lake and Channels Project until such time as a supplemental environmental impact statement is filed ... that corrects the deficiencies noted in [the second] memorandum opinion, and which complies with the National Environmental Policy Act of 1969 to the fullest extent possible."

Appeals to this court were filed by the Corps and the intervenors, who are the local government bodies which have sponsored the water-supply features of the project.

## III.

The issue presented by the appellants is whether the SEIS substantially complies with the requirements of NEPA. They argue that the district court grossly exceeded its authority when it enjoined the project pending the Corps' compliance with the district court's memorandum opinion.

■ NEPA requires federal agencies to consider the significant environmental consequences of their actions and to inform the public of the results of their research. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, ——, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). Consequently, the duties imposed by the statute have been described

---

1. For convenience, we will use the name TCNR to describe both of the plaintiffs, who are represented by the same attorneys and present a unified case.

2. *See* part IV, *infra*.

by the Supreme Court as "essentially procedural." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). NEPA does not require or authorize federal agencies to abdicate their other statutory responsibilities in pursuit of environmental goals. *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (per curiam).

■ As NEPA imposes a limited obligation on federal agencies, it similarly requires federal courts to exercise a limited form of judicial review when faced with a challenge to an agency's compliance with NEPA. The Supreme Court recently has said:

> The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.

*Baltimore Gas*, 462 U.S. at ——, 103 S.Ct. at 2253. Justice Marshall has pointed out that the federal courts have the primary responsibility for giving meaning to the rather vaguely worded requirements of NEPA and that the development of a " 'common law' of NEPA" has been the source of that statute's success. *Kleppe v. Sierra Club*, 427 U.S. 390, 421, 96 S.Ct. 2718, 2735, 49 L.Ed.2d 576 (1976) (Marshall, J., concurring in part and dissenting in part). In this circuit, we have endeavored to formulate a body of law that instructs federal agencies and federal courts in their efforts to comply with and enforce NEPA. In *Isle of Hope Historical Ass'n, Inc. v. United States Army Corps of Engineers*, 646 F.2d 215 (5th Cir.1981) (per curiam) (adopting opinion of district court), we summarized some criteria by which we have evaluated the adequacy of an EIS:

> (1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives; (2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

646 F.2d at 220, *citing Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority*, 576 F.2d 573 (5th Cir. 1978). We have consistently stated that judicial review of an agency's compliance must be guided by a "rule of reason" and that courts must not "fly speck" an EIS. *Sierra Club v. Sigler*, 695 F.2d 957, 965 (5th Cir.1983); *Citizens for Mass Transit, Inc. v. Adams*, 630 F.2d 309, 313 (5th Cir. 1980). Courts must "avoid placing extreme or unrealistic burdens on the compiling agency." *Isle of Hope*, 646 F.2d at 220.

■ In this case, the district court placed on the Corps the burden of responding to a memorandum opinion detailing defects in the SEIS, some significant, many trifling, spread over one hundred legal-sized pages. Although we cannot identify with certainty all of the defects which the district court considered fatal, we restrict our own review to issues which are truly substantial.[3] We concentrate on four areas in which the district court and the plaintiffs have identified what they characterize as material flaws in the SEIS. They argue that Corps violated NEPA by failing to present an adequate plan for the mitigation of losses to fish populations and aquatic habitats; by

---

**3.** We agree with the district court, for example, that criticisms by the United States Fish and Wildlife Service regarding the Corps' plan for mitigation of losses to fish populations were of some importance and probably should have been addressed more fully in the body of the SEIS rather than in Appendix B. However, the criticisms were set forth, as were the Corps' responses, in a way that meets the Corps' obligations under NEPA, and the district court had no authority to require the Corps to print those passages at any particular place in the SEIS.

We are more concerned by the district court's suggestion (admittedly dicta) that the project as described in the SEIS exceeds its congressional authorization. This issue was not before the court, and in any event is completely unrelated to the adequacy of the SEIS.

failing to discuss a water-supply-only alternative to the project; by failing to discuss supplies of water from sources other than the proposed reservoir; and by failing to present an adequate assessment of the costs and benefits of the plan and alternatives.

## IV.

Each of the four main areas in which the district court found the SEIS inadequate was first mentioned in its 1978 memorandum opinion. In the SEIS the Corps addressed these issues, but, as we shall explain in some detail, the district court was not satisfied with the Corps' attempts to meet its demands for changes in the EIS.

## A.

The EIS submitted in 1977 did not contain a plan for the mitigation of fish and wildlife losses resulting from the project. The district court found that the Corps had failed to cooperate with the United States Fish and Wildlife Service (USFWS) and the Texas Parks and Wildlife Department (TPWD), both of which had proposed the adoption of a mitigation plan. At that time, the Corps had not taken even the initial step of identifying the losses likely to result from the project.

The administrative regulations implementing NEPA require that EIS's meet the requirements of the Fish and Wildlife Coordination Act (FWCA). *See* 40 C.F.R. § 1502.25(a) (1983). That act requires federal agencies to consult with the USFWS and to develop some plan for the mitigation of losses to fish and wildlife populations that might result from proposed agency actions although the USFWS has no authority to require the agency to adopt its recommendations. *Zabel v. Tabb,* 430 F.2d 199, 213 (5th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971).

It is clear that the 1977 EIS did not meet the requirements outlined above. The

record before us now shows, however, as the district court acknowledged, that since 1978 the Corps has made substantial additional efforts to formulate a plan to mitigate adverse effects of the project. The Corps consulted with the USFWS and TPWD, which recommended that certain measures be taken in order to mitigate losses to populations of fish and wildlife. The Corps considered these recommendations during the development of the mitigation plans, and in fact the Corps adopted many of those agencies' suggestions. The Corps considered and rejected USFWS's request that water-flows downstream from the reservoir be maintained at a level higher than the level proposed by the Corps. (Neither the USFWS's plan nor the Corps's plan would fully compensate for losses to fish populations, especially to species of fish which must live in flowing streams.) The Corps also declined to recommend the acquisition of as much land for wildlife loss mitigation as USFWS suggested. The Corps' rationale for choosing to limit mitigation efforts in these ways is discussed in the fish and wildlife coordination report, which is appended to the SEIS.

Despite the evidence that the Corps cooperated with USFWS and TPWD, the district court concluded that the Corps had failed to meet its obligations to develop an adequate plan for mitigation of losses to fish populations and habitats.[4] The district court conducted a detailed review of each of the Corps' stated reasons for rejecting the USFWS plan. Most of its criticism is directed at the Corps' decision not to seek to renegotiate contracts held by local communities for their shares of the water which will be held in the proposed reservoir, on the theory that if the Corps bought back the water, the Corps could release the water downstream to preserve fish habitats. The Corps pointed out in the coordination report that many of these communities had already informed the Corps that they would need the full capacity for which they had contracted sooner than they had anticipated. The Corps rejected as uneco-

---

**4.** The district court approved the Corps' wildlife loss mitigation plan, and we do not have to

consider whether it satisfies the requirements of NEPA.

nomical the alternative of redesigning the reservoir to hold additional water which could be released to improve conditions for fish downstream from the reservoir.

 Now, on appeal, we must decide whether the Corps' efforts to cooperate with the USFWS were sufficient. Although there is no private right of action under the FWCA, an agency's compliance with its requirements may be reviewed judicially in an action brought under NEPA. *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346 (8th Cir.1972).[5] However, most courts which have addressed the issue have held that if an agency complies with the requirements of NEPA, it will also have satisfied the provisions of the FWCA. *See Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d at 356; *Environmental Defense Fund, Inc. v. Alexander*, 501 F.Supp. 742, 766–67 (N.D.Miss.1980), *aff'd in part, rev'd in part, sub nom. Environmental Defense Fund, Inc. v. Marsh*, 651 F.2d 983 (5th Cir.1981). The standard of review for the fish and wildlife loss mitigation aspects of the EIS is, therefore, no different from that applied to other parts of the EIS; that is, the reviewing court must decide whether the agency has investigated and considered the effects of its proposed action as required by the relevant statutes and whether the agency has reported fairly the results of its research and decision-making.

 Nothing in the opinion of the district court or in the arguments made to us by the appellees convinces us that the Corps violated NEPA in deciding to reject USFWS's recommendations. NEPA and FWCA do not require the Corps to adopt a mitigation plan that redresses all adverse impacts of its projects. Nor do they re-

quire the Corps to adopt all suggestions made by USFWS. Rather, the Corps meets the statutory requirements if it gives serious consideration to the views expressed by USFWS. *Sierra Club v. Alexander*, 484 F.Supp. 455, 470 (N.D.N.Y.), *aff'd*, 633 F.2d 206 (2d Cir.1980). The Supreme Court has made it clear that to "consider" environmental factors does not mean to give them special weight. *Strycker's Bay*, 444 U.S. at 227–28, 100 S.Ct. at 500. The Corps considered the recommendations of the USFWS and articulated its reasons for rejecting those recommendations. In doing so, it fulfilled its statutory obligations.

### B.

In the 1978 memorandum opinion the district court found the Cooper Lake EIS deficient because it did not discuss, as an alternative to the Cooper Lake project, the possibility of constructing the reservoir solely to meet water-supply needs, without the planned recreational facilities.[6] The court also ordered the Corps to develop a nonstructural flood control alternative. The Corps followed these instructions, and the water-supply-only and the nonstructural flood control plans were two of the five alternatives discussed fully in the SEIS.[7]

The district court now holds that the Corps should have presented as a separate alternative the combination of these plans. The Corps noted in the summary to the SEIS that the comprehensive nonstructural flood-control plan "could be implemented in conjunction with the Water Supply Only alternative to fulfill all project purposes." The district court stated that the costs and benefits of the combined alternatives could

---

5. *See also Sierra Club v. Sigler*, 695 F.2d at 967 (Corps of Engineers must integrate other statutory commands with the requirements of NEPA).

6. The Corps did not appeal the 1978 order; however, it has maintained in this appeal that recreation is an authorized purpose of the Cooper Lake project. NEPA requires consideration of only those alternatives which meet project goals. We are perplexed by the Corps' seeming-

ly inconsistent positions on this issue, but in view of our holding that the discussion of the water-supply-only alternative is adequate, we need not decide whether NEPA requires such a discussion.

7. The Corps initially considered an array of approximately twenty-five alternative projects, from which these five were considered for comprehensive treatment in the SEIS.

not be properly evaluated from the information provided in the SEIS; in fact, the district court seems to have found that the combined alternative would have been obviously superior to the chosen plan if it had been presented fairly in the SEIS. The court also found that the Corps had rejected the two plans by "parallel discursive reasoning"; i.e., it rejected each because it did not have the benefits of the other.

■ We find that the presentation of these alternatives in the SEIS complies with the requirements of NEPA. In the first place, the district court's holding that the Corps did not properly evaluate or present in the SEIS the possibility of combining the two alternatives is not supported by the record. The Corps explicitly acknowledged that the two plans could be implemented simultaneously in order to meet the goals of the project. In addition, by making this fact plain on page 3 of the SEIS, the Corps alerted any discerning reader that combining the alternatives was possible. We realize that the cost-benefit ratios for the combined project would differ from those of the two individual projects. We conclude, however, that the Corps stated reasons for rejecting both component alternatives which also justify rejection of the combined plan. Both the water-supply-only plan and the comprehensive nonstructural flood control plan depend on the efforts of local sponsors. The Corps was of the opinion that the local sponsors would be much less likely than the federal government to purchase land for mitigation of losses to wildlife. The Corps concluded that the water-supply-only plan could result in the loss or degradation of thousands of acres of wildlife habitat. The nonstructural flood control plan, on the other hand, depends on the enactment of restrictive zoning across the flood plain of the Sulphur River. Although the plan, if fully implemented, had net benefits, the Corps found that the probability of full implementation was low. To the extent that the failure to include a new set of cost-benefit charts is an omission in the SEIS, it is not a material or fatal one because the combined plan clearly would

not have overcome the Corps' objections. The failure of the Corps to restate these objections in response to a combined alternative does not impair significantly the clarity of the Corps' assessment that the alternatives, though possible, were inferior to the chosen plan.

C.

The third area of the SEIS which the district court found inadequate is the discussion of alternate sources from which the water-supply needs of the local sponsors might be met. The Corps does not dispute the fact that this section of the SEIS contains some inaccuracies or that a significant development in the region's water-availability "picture" was omitted. The Corps argues that most of the inaccuracies are *de minimis* and that the failure to mention the City of Dallas' contract for water from Lake Fork was justifiable because the contract was not made until after the SEIS was finished. The Corps also argues that its rejection of some water-supply projects which the district court found should have been discussed as alternatives to Cooper Lake was reasonable.

■ The SEIS contains an extensive evaluation of the water-supply needs of the communities which have made contracts to buy water from the Cooper Lake reservoir. It also contains an analysis of potential water sources for those communities that might be viable alternatives to Cooper Lake. Also included is a discussion of the water needs of the City of Dallas, which has a legal obligation to resell its excess water to some of the cities which will receive water from Cooper Lake. The district court's objections to this part of the SEIS center on four omissions. First, the Corps failed to state in the SEIS that the City of Dallas made a contract to purchase 107 million gallons per day (m.g.d.) of water from Lake Fork. The SEIS states that this water is unavailable for purchase, and that was, in fact, the case until about one week before the SEIS was published. At that time, Lake Fork water became avail-

able for sale, and Dallas announced its intention to negotiate the purchase of some Lake Fork water. The purchase contract became final in July 1981, several months after the SEIS was published. The district court held that the SEIS should have included mention of the negotiations between Dallas and the Lake Fork water owners, or alternatively, that the Corps should have issued a second SEIS to discuss Lake Fork.

The district court was of the opinion that the Lake Fork contract was of such great significance that the omission described above was fatal to the SEIS. We disagree. The Corps considered as one factor in evaluating the needs of the local water sponsors the fact that some of them had contracts for the purchase of water from Dallas. The Corps found that there was a risk that the City of Dallas would refuse to renew these purchase contracts in the early part of the twenty-first century because of growth of its own water supply needs. Although Dallas' purchase of water from Lake Fork reduces that risk, we do not find any evidence in the record before us that this new development *substantially* decreases the need for additional sources of water in north Texas.[8]

TCNR has not shown that the execution of the Dallas-Lake Fork contract significantly affects the probability that Dallas will cancel its contracts with the Cooper Lake water-supply sponsors. Therefore, it has not met its burden of proving that the Corps should have supplemented the SEIS or that the Corps should have delayed the printing of the SEIS when it discovered, at the last minute, that the contract negotiations were under way. *See Environmental Defense Fund, Inc. v. Marsh,* 651 F.2d 983, 992 (5th Cir.1981).

With respect to the remaining limitations in the Corps' discussion of water-supply alternatives, we simply hold that the record does not support a conclusion that these limitations are unreasonable. An environmental impact statement may not be held insufficient by a court merely because the agency has failed to discuss in it every conceivable alternative to the proposed project. Federal agencies must be free to make reasonable limitations on the scope of their discussions of such alternatives. Case law binds us to uphold the Corps' decision unless it is arbitrary and capricious. *See Vermont Yankee,* 435 U.S. at 551–52, 98 S.Ct. at 1215–16. The Corps excluded a number of projects because they involved transporting water over long distances. The district court held that the Corps failed to explain adequately the criteria by which it decided which sources were too far away. Similarly, the district court rejected the Corps' finding that conversion of Red River water (which is not potable because of its high salt content) was too expensive to constitute a viable alternative to Cooper Lake. In other words, the district court required the Corps to prove that its selection of alternative water-supply sources was reasonable. This approach turns the review process on its head: it is the party seeking to invalidate an EIS, *not the agency,* which has the burden of proof on this issue. The plaintiffs continue this error on appeal. In their brief, rather than argue that they have demonstrated the choices to be unreasonable, they argue that the Corps has not demonstrated these choices to have been reasonable. In our review of the evidence before the district court, we do not find a preponderance of proof that the Corps' discussion of water-supply alternatives is unreasonably limited.

### D.

The final area in which the district court found the SEIS inadequate is the analysis of the relative costs and benefits of the project and its alternatives. This court has held that the scope of review of cost-benefit analyses under NEPA is extremely circumscribed. The court may not review an agency's determination of the economic benefits of a proposed federal action unless

---

**8.** The studies performed by the Corps indicate that the water needs of the communities in the area to be served by Cooper Lake will increase dramatically over the next thirty to forty years. Dallas predicts that it will experience a water shortage during that time.

the challenging party has shown that "economic considerations ... were so distorted as to impair fair consideration of [the project's] environmental consequences." *South Louisiana Environmental Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir.1980). Even upon such a showing, the court may enjoin a project only where "the actual balance of costs and benefits struck by the agency ... was arbitrary or clearly gave insufficient weight to environmental factors." *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d at 356. *See also Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123, 1139–40 n. 33 (5th Cir.1974).

In the 1978 opinion, the district court emphasized the Corps' failure to use the values prescribed in *Principles and Standards*, which the current regulations recommend. *See* 18 C.F.R. § 711.3 (1983). In fact, the court ordered the Corps to incorporate the *Principles and Standards* values into the EIS. The Corps did not use these values in the body of the SEIS, but it did set them forth in tables which are appended to the SEIS. The district court acknowledges that NEPA does not mandate (or justify the court's mandate of) the use of any particular values for use in cost-benefit analyses. The only justification for reversal of the Corps' decision to use particular figures is that they are clearly weighted unfairly. The district court was not justified in holding that the values used in the SEIS were unfairly weighted against environmental concerns. Indeed, the Corps included the values suggested by the district court in its earlier opinion. The fact that these figures were published in appendices does not establish that the Corps failed to consider them. In fact, there is evidence in the record that the Corps *inflated* some environmental values in these tables. In sum, we find no evidence in this record to establish that the Corps failed to take the required "hard look" at the environmental consequences of the Cooper Lake project in relation to the project's expected economic benefits.

## V.

The injunction issued by the district court in this case violates the basic premises of judicial review under NEPA. It requires the Corps of Engineers to rewrite the SEIS in accordance with a one-hundred-page opinion. We have addressed all of the substantial issues raised in the opinion. Most of the minor points raised therein relate to one of the four areas we have discussed but do not bear directly upon whether the Corps' supplemental environmental impact statement substantially complied with NEPA. Because the injunction exceeded the court's authority, its judgment must be reversed, and accordingly, the injunction entered on March 21, 1983, is dissolved. Let the work on this project, legally halted since 1971, begin.

REVERSED; INJUNCTION DISSOLVED.