ASSOCIATION CONCERNED ABOUT
TOMORROW, INC. ("ACT"), and
Harry Englert, Plaintiffs,

v.

Rodney E. SLATER, as Secretary of the United States Department of Transportation, Jane Garvey, as Acting Federal Highway Administrator, David M. Laney, Chair, Texas Transportation Commission, and David E. Bernsen and Anne S. Wynn, . Commissioners, Texas Transportation Commission, Defendants.

Civil No. 3:83–CV–0585–H.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 18, 1998.

David O. Frederick & Kelly L. Haragan, Henry Lowerre Johnson Hess & Frederick, Austin, TX, for plaintiffs.

Mary Ann Kilgo, Assistant United States Attorney, Department of Justice, Dallas, TX, Charlene Sanders Bassel, Fedreal Highway Administration, Ft. Worth, TX, Ronda Leigh Neff, Assistant Attorney General of Texas, Austin, TX, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SANDERS, Senior District Judge.

Before the Court is the Defendants' Motion to Dissolve Injunction and Dismiss Suit, filed April 7, 1998, Response of Plaintiffs ACT and Englert, filed April 28, 1998, and Reply to Plaintiffs ACT and Englert, filed May 13, 1998. The Court held an evidentiary hearing on July 13, 14, and 15, 1998.

This lawsuit, originally filed in 1983, was brought for declaratory and injunctive relief challenging the construction of a federally funded primary highway route, designated State Highway 161 (SH 161), through Grand Prairie, Texas. On June 14, 1985, the Court enjoined construction of the highway south of Rock Island Road, Grand Prairie. *Association Concerned About Tomorrow, Inc. v. Dole,* 610 F.Supp. 1101 (N.D.Tex.1985) (ACT I). Defendants move to dissolve the 1985 injunction.

Based on the pleadings, the evidence adduced at the July 1998 hearing, the stipulations, the arguments of counsel, the notes of the Court and the law clerk, the Court concludes that the Defendants have complied with the requirements of the National Environmental Policy Act, 42 U.S.C. § 4231, the mandates of a § 4(f) Evaluation, 49 U.S.C. § 303, and the public participation directives found in 23 U.S.C. § 128, as well as the rulings of the United States Supreme Court, and law of the Fifth Circuit Court of Appeals. Accordingly, the Court makes the following findings of fact and conclusions of law. Any findings which constitute conclusions or conclusions which constitute findings should be deemed the other, as appropriate.

### PARTIES & JURISDICTION

1. Defendants seek dissolution of the 1985 injunction.

2. Plaintiffs ACT and Englert allege Defendants have not complied with the 1985 injunction and seek to maintain the injunction.

3. This Court has jurisdiction of the subject matter of this cause pursuant to 28 U.S.C. § 1331. *Environmental Defense Fund v. Corps of Engineers,* 348 F.Supp. 916 (D.Miss.1972), *aff'd,* 492 F.2d 1123 (5th Cir.1974).

4. Proper venue for this cause is in this Court.

## HISTORY OF THE PROJECT

1. The history of this project is recounted in extensive detail in the opinion issued by this Court in 1985 and in the parties' stipulated facts as submitted in the PreTrial Order, filed July 1, 1998, and need not be discussed here. *See ACT I, supra.*

2. After the 1985 injunction was ordered, a consulting firm was retained by the Defendants to study environmental impacts of the proposed SH 161. (Stipulated)

3. The Federal Highway Administration (FHWA) approved a Draft Environmental Impact Statement (DEIS) for SH 161 from IH 20 north to SH 183 on October 13, 1989. (Stipulated).

4. On September 9, 1994 a Supplemental DEIS for SH 161 was approved for circulation by FHWA. The Supplemental DEIS was prepared because more than 3 years had expired since the October 1989 DEIS was approved for circulation and issued. Substantive changes in federal laws, including the Clean Air Act Amendments and the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA) also mandated supplementation. (Stipulated).

5. An Open House and Public Hearing was held at the Grand Prairie High School on October 15, 1994. (Stipulated).

6. The Supplemental Final Environmental Impact Statement (SFEIS) (Dx 2A, 2B) was approved by the Texas Department of Transportation (TxDOT) on October 16, 1996 and by the FHWA on October 11, 1996. (SFEIS cover sheet). A Record of Decision was issued by the FHWA on April 7, 1997. The Record of Decision approves the selection of Alternative 2A from among 9 alternative routes and the no-build option. Alternative 2A requires the taking of a portion of C.P. Waggoner Park, and the Record of Decision approves of the SFEIS' conclusion that there is no feasible and prudent alternative to the use of the parkland. (DX–3).

## STANDARD OF REVIEW & RELEVANT AUTHORITIES

1. This litigation is governed by the Administrative Procedure Act (APA), 5 U.S.C. § 706. The standard of judicial review under the APA is whether the Defendants' actions were "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *See, id.*

2. On a motion to dissolve an injunction, the issue is whether the defendants have properly performed their obligations under the injunction. *Sierra Club v. Froehlke,* 816 F.2d 205 (5th Cir.1987).

3. The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321–4370e (1994 & Supp.), requires federal agencies to consider the significant environmental consequences of their actions and to inform the public of the results of their research. The substantive determinations made by the federal agency in preparing the environmental document are reviewed according to the requirements of NEPA, and are not to be second-guessed because NEPA, while setting forth significant substantive goals for the nation, is essentially procedural. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 555–58, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

4. In evaluating the sufficiency of an Environmental Impact Statement (EIS), the focus of the court should be on the administrative record upon which the administrator's determination was made. *Louisiana Environmental Society, Inc. v. Dole,* 707 F.2d 116, 119 (5th Cir.1983); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

5. The scope of judicial review of a NEPA decision by an agency is to determine whether the agency sufficiently considered the environmental consequences of a proposed action. The Court may not intrude into the discretion of the agency to

choose the course of action to be taken. *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

6. Judicial review in a NEPA case is focused on the administrative record already in existence and is not a *de novo* record compiled in the district court trial. *Avoyelles Sportsmen's League v. Marsh,* 715 F.2d 897, 905 (5th Cir.1983).

■ 7. A court may also receive and weigh evidence beyond that in the administrative record. *Fritiofson v. Alexander,* 772 F.2d 1225, 1237 (5th Cir.1985). A divergence of opinions among experts is not sufficient to render an environmental study by an agency inadequate. *South Louisiana Environmental Council v. Sand,* 629 F.2d 1005, 1014 (5th Cir.1980).

■ 8. The Court will defer to the agency's scientific expertise, unless it is overborne by substantial and credible evidence of arbitrary and capricious action. *Avoyelles Sportsmen's League v. Marsh,* 715 F.2d 897, 906–907 (5th Cir.1983).

■ 9. In reviewing a 4(f) (use of parkland for highway) evaluation, 49 U.S.C. § 303, the Court must first determine that the agency acted within its scope of authority and then determine whether or not the agency finding was arbitrary or an abuse of discretion. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–17, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ 10. A reviewing court must assess the agency's decision on the basis of information that was available at the time the decision was made. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 547, 554–55, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

### NEPA CLAIMS: FINDINGS AND CONCLUSIONS

1. Before this Court are five issues arising under NEPA:

(1) whether the SFEIS noise analysis is inadequate;

(2) whether the SFEIS analysis of air quality impacts is inadequate;

(3) whether the SFEIS analysis of social, economic and land use impacts is inadequate;

(4) whether the SFEIS wetlands analysis is inadequate; and

(5) whether the SFEIS alternatives analysis is inadequate.

*See,* Joint Pre–Trial Order, filed July 1, 1998.

2. The scope of judicial review of an agency's compliance with NEPA is limited. *Texas Committee on Natural Resources v. Marsh,* 736 F.2d 262 (5th Cir.1984) (*"TCONR v. Marsh"*), *rehearing denied,* 741 F.2d 823 (1984).

3. The role of the Court is to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious. *Baltimore Gas Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

4. In evaluating the compliance of an EIS with NEPA, a court must ask:

(1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of the proposed action;

(2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and

(3) whether the EIS's explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

*TCONR v. Marsh, supra.*

5. In making and acting on the *TCONR v. Marsh* inquiries, the Court applies the "rule of reason" and does not "fly-speck" the EIS. *Sierra Club v. Sigler,*

695 F.2d 957, 965 (5th Cir.1983) (citations omitted).

## A. NOISE ANALYSIS

6. In 1985, the Court found the Defendants' noise analysis inadequate. *ACT I,* 610 F.Supp. at 1111.

7. The noise analysis in an SFEIS analyzes the potential increases in existing noise levels due to the proposed highway and determines the areas, if any, where noise mitigation measures (e.g. noise walls) will be needed.

8. 23 C.F.R. Part 772 establishes the standards to follow in order to conform to Federal Highway Administration noise standards. These standards require (1) the identification of land uses or activities along the project, (2) a prediction of traffic noise levels, (3) the determination of the existing level of noise, (4) a determination of traffic noise impacts, and (5) examination and evaluation of noise abatement measures.

9. This discussion is contained in the SFEIS in sections V and VI, specifically V–113 through V–120, inclusive, VI–67 through VI–71, inclusive, VI–143 through VI–160, inclusive, and Appendix P, "Noise Mitigation."

10. The SFEIS documents the analysis of the noise impacts according to the guidelines set forth in 23 C.F.R. Part 772. The future noise levels were predicted using a state of the art methodology (STAMINA 2.0/OPTIMA 1.0 noise programs). The noise impact assessment evaluated each of the nine alternatives and concluded that Alternative 2A had the fewest impacted receivers, i.e ., the least noise impacts among the nine alternatives. The noise analysis projections given in the SFEIS were for an ultimate 8 to 10 lane facility, but an analysis of the 4 to 6 lane highway also was performed for Alternative 2A for the year 2010 project.[1] SFEIS

concluded that the difference in the noise analysis for the facility shown in the year 2010 and the ultimate facility was negligible. SFEIS, VI–145.

11. The SFEIS also discusses the various noise abatement criteria used to analyze potential noise mitigation measures, such as earth berms or noise walls. This analysis was modeled for each of the nine alternatives. The discussion complies with the requirements set forth in 23 U.S.C. § 109(h) and (i), and 23 C.F.R. 772. *See,* SFEIS, VI–145 through VI–159; Tables 56–70.

12. Plaintiffs presented the expert testimony of Todd A. Busch, a consultant who routinely works on projects involving transportation, community, and environmental noise studies. He stated that, in his opinion, the SFEIS did not take a hard look at the total environmental consequences identified with noise impacts. Mr. Busch criticized the Defendants' methodology and modeling assumptions. Mr. Busch testified that the no-build alternative was not analyzed for noise impacts, and that the SFEIS does not explain the effect that the increased levels of noise caused by the proposed project will have on persons living near the project. (Busch testimony, July 13, 1998).

13. Defendants responded by offering the expert testimony of Dejan Perge, project manager of SH 161 since 1994, and the TxDOT individual in charge of coordinating and reviewing the Environmental Impact Statement document preparation. He testified that the noise measurements were taken at numerous sites along the alternative corridors. Of these sites, fifty-one (51) were identified as representative of sensitive areas for noise receptors, such as schools, places of worship, parks, residences, and hospitals. Comparing the noise impacts on the different alternatives,

1. The year 2010 project is a 4 to 6 lane highway built on the footprint of an ultimate 8 to 10 lane highway. The project must be constructed in stages, first 4 to 6 lanes, then 8 to 10 lanes. This process of constructing the highway in stages is due to the limited funding and the financial restraints imposed on transportation projects by the Intermodal Surface Transportation Act of 1991. *See, infra* at ——.

he concluded that Alternative 3B impacted the most receivers and Alternative 2A impacted the fewest receivers. He also contradicted Plaintiffs' expert by pointing out the no-build alternative noise impacts were analyzed in the SFEIS at Table 33, V–119 and V–120.

14. Upon review of the relevant portions of the SFEIS, this Court is of the opinion that the Defendants sufficiently determined and analyzed the anticipated traffic noise impacts and alternative noise abatement measures to mitigate those impacts, giving weight to the benefits and costs of abatement, and to the overall social, economic and environmental effects. *See* 23 C.F.R. § 772.9(a).

15. The noise analysis contained in SH 161 SFEIS complied with the standard set forth in 23 C.F.R. § 772.17, and the Court finds that the Defendants' methodology for noise analysis was reasonable and sufficient. *See Sierra Club v. U.S. Department of Transportation*, 753 F.2d 120, 128 (D.C.Cir.1985).

## B. AIR ANALYSIS

16. In 1985, the Court found Defendants' air analysis inadequate. *ACT I*, 610 F.Supp. at 1110.

17. The air analysis determines and assesses the effects of the proposed highway on air quality within the corridor. The Clean Air Act requires that transportation projects be demonstrated to "conform" to the State Implementation Plan (SIP), as referred to in the SFEIS, for the area in which the project is located. These requirements are set out at § 176 of the Clean Air Act, 42 U.S.C. § 7506.

18. The discussion of air analysis is contained in the SFEIS at sections V–109–112; VI–138–42; and VIII–2, as well as Appendices R, S, and U.

19. The SFEIS reveals that an air quality analysis was performed using a computer dispersion model (CA-LINE3/MOBILE5A) for the proposed highway facility. This model is specifically designed for the prediction of pollutant concentrations in the vicinity of highways.

20. Using the model for the nine alternative routes, no substantial air quality impacts were anticipated for any area along the nine alternatives, and all calculated concentrations of CO were below the National Ambient Air Quality Standards (NAAQS) as set by the EPA. *See* SFEIS, VI–142, Tables 54 and 55.

21. Also, the control of ozone is accomplished on a region wide basis, rather than a project-by-project basis, through the SIP.

22. The air quality impacts are analyzed to see if the impacts conform to the SIP. The SFEIS explains that the Intermodal Surface Transportation Act of 1991 (ISTEA) provided certain guidelines for the implementation of the regional transportation improvements. One notable requirement of ISTEA is that all projects are constrained to available financial resources. "Mobility 2010," a regional long-term transportation plan for the year 2010 for North Central Texas was updated ("Mobility 2010: Plan Update") in response to the planning and management requirements of ISTEA.

SH 161, as a 4 to 6 lane facility, was included in the Dallas/Fort Worth regional conformity analysis and was included in the Mobility 2010: Plan Update. The SFEIS shows that the Plan Update was determined to be in conformity with the State Implementation Plan. SFEIS, at iii.

23. The SFEIS concludes that the air quality study complies with the state of the art in existence at the time, and the requirements of NEPA.

24. Plaintiffs' expert, Dr. Randall Guensler, Assistant Professor in the School of Civil and Environmental Engineering at the Georgia Institute of Technology, characterized the carbon monoxide analysis as inadequate because there was no actual comparative analysis studied, and criticized the conformity analysis for not analyzing the ultimate 8 to 10 lane facility suggesting that the larger project would violate the conformity standards of

the SIP. (Guensler Testimony, July 14, 1998).

25. Defendants offered the expert testimony of Michael Morris, Director of Transportation for North Central Texas Council of Governments (NCTCOG), who defended the conclusion that the SH 161 corridor ultimately required an 8 to 10 lane facility. Morris also explained that the 4 to 6 lane facility accurately addresses the current needs for solving congestion in the Dallas–Fort Worth area given the present constraints of limited funding. Defendants also offered Kenneth D. Kirkpatrick, Principal Transportation Planner for the NCTCOG, who concluded that the ultimate SH 161 8 to 10 lane highway was properly excluded from the air quality conformity analyses conducted for Mobility 2010 Plan Update. (Kirkpatrick Testimony, July 14, 1998).

26. Plaintiffs did not establish that the air analysis studies were incorrect as to methodology or conclusion. Notably, Plaintiffs' expert Dr. Guensler admitted on cross-examination that he does not believe the CO levels along SH 161 would be violative of ambient air quality standards.

27. Moreover, Plaintiffs' allegation that TxDOT is piecemealing projects, i.e., starting with a 4 to 6 lane highway then building up to an 8 to 10 lane highway, in an attempt to subvert the conformity requirements for the ultimate larger highway remains unsubstantiated. The SFEIS states in more than one place that the ultimate 8 to 10 lane SH 161 will be built in the future only after a reexamination of the corridor's environmental concerns and the fiscally constrained transportation plan. *See e.g.,* VI–142. Accordingly, the Court finds that the Defendants' air analysis was reasonable and sufficient.

## C. ANALYSIS OF SOCIAL, ECONOMIC AND LAND USE IMPACTS

28. In 1985, the Court found this analysis "barely adequate." *ACT I,* 610 F.Supp. at 1111.

29. Social, economic, and land use impacts are discussed in various places in the SFEIS including sections IV–3 through IV–4, VI–1 through VI–9, VI–16, and VI–24 through VI–25.

30. The SFEIS states that the analysis utilized published data available at the time, field inspections of the project area by project staff, interviews with knowledgeable persons, and consultations with representatives of the impacted community governments, to draw an accurate picture of the project area's social, economic, and land use environments.

31. Plaintiffs complain that the SFEIS did not analyze and discuss the impacts to property values, the visual blight caused by the highway, the barrier effect on the community, and the developmental impacts. *See* Plaintiffs Designation of Deposition Excerpts for Dr. Susan Handy, filed July 9, 1998.

32. Defendants offered the expert testimony of Dan Gise who prepared the updated socio-economic environment and socio-economic impacts sections of the SFEIS. Gise explained the areas in the SFEIS where it addressed land use and social impacts for each alternative and the conformity to the City of Grand Prairie's land use plan.

33. Although NEPA emphasizes the need for multidisciplinary analysis, economic and social impacts occupy a lesser tier of importance in an EIS than do purely environmental or ecological concerns. *See ACT I,* 610 F.Supp. at 1111.

34. The Court finds that the discussion of the social, economic, and land use impacts in the SFEIS is adequate. Dr. Handy states in her deposition in response to whether the SFEIS took an objective hard look at the consequences of the new highway, "I don't believe they took a hard enough look." (Handy Deposition Excerpts, p. 41). But NEPA only requires a "reasonably thorough discussion that fosters informed decisionmaking, not a complete evaluation." *Stop H–3 Ass'n v. Dole,* 740 F.2d 1442, 1462 (9th Cir.1984).

35. With respect to the social, economic, and land use impacts analysis contained in the SFEIS, Plaintiffs did not establish that Defendants failed to take a hard look at the environmental consequences of the proposed action. *TCONR v. Marsh, supra.* Defendants' analysis was reasonable and sufficient.

## D. WETLANDS

36. The analysis of impacted wetlands is discussed primarily in the SFEIS at sections V–61 through V–63, VI–107 through VI–121, and appendix G.

37. The SFEIS discusses the impacts of all the route alternatives on the wetlands and jurisdictional waters. Impacted acreage of wetlands are given, along with soil type and ecosystem classification. Impacted acreage of waters of the United States are also given in order to assess Section 404 of the Clean Water Act's requirements, and to show the total impact each route alternative would have on the West Fork of the Trinity River basin. *See*, SFEIS VI–113 through VI–121, Tables 35–43.

38. The SFEIS concludes that Alternatives 2D and 3B have the most significant impacts on wetlands, and the remaining route alternatives would each cause relatively minor impacts to the wetlands and jurisdictional waterways, specifically impacting less than 0.4 hectare (one acre) of wetlands.

39. Plaintiffs contend that the SFEIS does not provide sufficient information on the importance of the wetlands taken by the preferred alternative 2A or the other alternatives, or on possible mitigation of the wetlands impacts, to support informed decision making.

40. However, Plaintiffs failed to produce any evidence on this issue.

41. Accordingly, with respect to the wetlands analysis contained in the SFEIS, the Court finds that the SFEIS provides sufficient detail to allow those who did not participate in its preparation an understanding of the pertinent environmental influences. *TCONR v. Marsh, supra.*

The SFEIS analysis was reasonable and sufficient.

## E. ALTERNATIVES ANALYSIS

42. In 1985, the Court found this analysis unsatisfactory. *ACT I*, 610 F.Supp. at 1112.

43. Section 102(2)(c)(iii) of NEPA requires a federal agency in assessing the environmental effects of a project to discuss alternatives to the proposed action. The purpose of the alternatives requirement is to assure that the government agency as a decision-making body has considered methods of achieving the desired goal through means other than the proposed action. *Piedmont Heights Civic Club v. Moreland*, 637 F.2d 430, 436 (5th Cir.1981).

44. An environmental impact statement may not be held insufficient by a court merely because the agency has failed to discuss in it every conceivable alternative to the proposed project. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 554, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

45. The SFEIS discusses the alternatives considered in various places, most significantly in sections III–1 through III–32, IV–1 through IV–40, and VIII–1 through VIII–8.

46. The SFEIS discusses in detail nine route alternatives for SH 161 and the no-build alternative. These nine alternatives were developed by a process of elimination in three phases. The discussion incorporates strategies to reduce congestion and makes determinations of traffic sources and methodology. In addition, an analysis of widening other comparable parallel roadways was considered. *See* SFEIS, Appendix G, for a discussion of reasons for the elimination of various alternatives and segments.

47. Plaintiffs challenge the adequacy of the SFEIS on the ground that the statement did not properly consider all of the available alternatives to the construction of

the highway alignment contemplated. Specifically, Plaintiffs contend that the SFEIS does not consider the 2D Crossover, Superstreets, Loop 12, or SH360 alternatives; therefore, Plaintiffs argue, the SFEIS does not present sufficient alternatives to allow the decision maker to make an reasoned, informed decision. Also, Plaintiffs criticized the analysis of the no-build alternative.

48. Defendants responded that both Loop 12 and SH360 were evaluated in the SFEIS. In addition, Defendants presented testimony that Superstreets were a tradeoff between access and mobility, and that the local government did not favor disrupting arterial streets for Superstreets. (Kessler Testimony, July 14, 1998).

49. The Court finds that the discussion of the alternatives contained within the SFEIS is reasonable and sufficient. Federal agencies must be free to make reasonable limitations on the scope of their discussions of such alternatives. *TCONR v. Marsh, supra.* The Court finds that the SFEIS' discussion of alternatives is sufficient to enable a decision-maker to draw a conclusion about the comparative environmental risks of each of the proposed alternatives.

### ANALYSIS OF SECTION 4(f) EVALUATION

1. In 1985, the Court found Defendants section 4(f) analysis inadequate. *ACT I,* 610 F.Supp. at 1115–17.

2. Section 138 of the Federal Highway Act ("Section 4(f)") provides that the Secretary shall not approve any program or project that requires the use of public parkland unless: (1) there is no feasible and prudent alternative to the use of such land and (2) such program includes all possible planning to minimize harm to such park resulting from that use. 23 U.S.C. § 138. *See also,* 49 U.S.C. § 303.

3. FHWA regulations implementing 23 U.S.C. § 138 and 49 U.S.C. § 303 are found at 23 C.F.R. § 771.135.

4. As interpreted in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) and in this circuit, the first prong of the § 4(f) analysis requires that each "alternative to the use" of the parkland must be found to either infeasible or imprudent before the Secretary can approve the use of the parkland. *Louisiana Environmental Society, Inc. v. Coleman,* 537 F.2d 79, 85 (5th Cir.1976) ("Louisiana Environmental"); *Finish Allatoona's Interstate Right, Inc. v. Brinegar,* 484 F.2d 638 (5th Cir. 1973).

The 5th Circuit in *Louisiana Environmental* specifically held that "[a]n alternate route that also impacts upon parks and historic sites is not an 'alternative to the use' of such property." *Louisiana Environmental,* 537 F.2d at 85. Thus, in making the § 4(f)(1) assessment, the Secretary is concerned only with those alternatives that do not also impact on 4(f) parks and historic sites.

5. The SFEIS discusses the Section 4(f) evaluation in sections VI–26 through VI–101, inclusive, and Appendices L, N, R, S, and U.

6. The SFEIS' 4(f) evaluation describes the need for the project, discusses the 4(f) impacts of each route alternative, selects Alignment 2A as the feasible and prudent alternative that causes the least harm to 4(f) resources, and then details measures to be taken to minimize the harm to 4(f) resources.

7. The § 4(f) statement discusses 8 alternatives to the 2A alignment plus the no build alternative. Of these, alternative 2F and the no-build option are the only alternatives to the use of § 4(f) areas because the other proposals contemplated the "use" of parklands, wildlife preserves and/or historic sites to some degree.[2]

**2.** Ironically, prior to 1985 Plaintiff Harry Englert authored a petition, ultimately signed by 284 citizens, urging a shift from the then chosen alignment, which at the time was Al-

ternative 2F, to an alignment running through Waggoner Park. *See* Stipulation # 12; *see also, ACT I,* 610 F.Supp. at 1119. Plaintiff

*Druid Hills Civic Ass'n, Inc v. Federal Highway Admin,* 772 F.2d 700, 714 (11th Cir.1985).

 Thus, Alternative 2F and the no-build alternative must be analyzed for feasibility and prudence. The Supreme Court defined "feasible" and "prudent" in *Overton Park.* An alternative is feasible if it can be built as a matter of sound engineering. 401 U.S. at 411, 91 S.Ct. 814. An alternative is prudent unless there are "truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reach extraordinary magnitudes," or the alternative routes present "unique problems." *Id.* at 413, 91 S.Ct. 814.

 8. The Secretary concluded that Alternative 2F was imprudent due to strong local opposition, and traffic noise impacts disrupting 14 neighborhoods and apartment communities. Alternative 2F would cause 138 total displacements including three places of worship and 115 single family residences. Also, Alternative 2F would cost $12,000,000 more than 2A to construct. *See* Section VI–38 through VI–47. The Secretary also concluded that the no-build option was not prudent because it failed to meet the need and purpose which the project was designed to address. The SFEIS documents the need for the project as attributable to the continued growth in population and employment in the area. This rapid growth in the region is surpassing the transportation system's ability to accommodate it, resulting in more congestion and higher traffic demand. *See* SFEIS, VI–26 through VI–28 for specific figures on growth and transportation demand. These figures emphasize the need for improvements to the existing transportation system. The Secretary reasonably concluded that due to the predicted increases in population, employment, transportation demand, and congestion, SH 161 would serve the essential purpose of creating local regional mobility.

Englert now protests the Defendants' decision to construct SH 161 through a portion of

9. Having reviewed the 4(f) evaluation, this Court finds that the Secretary reasonably concluded that there were no feasible and prudent alternatives to the use of 4(f) properties. Plaintiffs' contend that the no-build option was not sufficiently evaluated. (Butler Testimony, July 13, 1998). However, the caselaw in this circuit provides support for the conclusion that the Secretary reasonably rejected the no-build option as imprudent for failure to fulfill the need for the highway within the SH 161 corridor. *Louisiana Environmental, supra* at 85; *see also Druid Hills, supra* at 715.

 10. The 4(f) evaluation is a two-part analysis. The first prong is analyzing whether there is any feasible and prudent alternative to the use of 4(f) resources. The Court having concluded above that the Secretary reasonably concluded that there is not, the Court turns next to the second prong. The second prong requires that all possible planning to minimize harm to the parkland must be accomplished before the Secretary can approve the parkland route. Relocation of the highway through another portion of the § 4(f) area or through other § 4(f) properties must be considered as a means of minimizing harm. *Louisiana Environmental,* 537 F.2d at 85. As explained in *Louisiana Environmental,* this requires a balancing process which totals the harm caused by each alternate route to § 4(f) areas and selects the option which does the least harm. *Id.* at 85–86. The only relevant factor in making a determination whether an alternative route minimizes harm is the quantum of harm to the park or historic site caused by the alternative. If the route does not minimize harm, it need not be selected. The Secretary is free to choose among alternatives which cause substantially equal damage to parks or historic sites. *Id.* at 85–86.

Waggoner Park.

Furthermore, the Secretary does not have to accept an alternate route which causes less harm to parks and historic sites. Rather, the route must also be feasible and prudent. *See Druid Hills, supra.* Thus a route that does minimize harm can still be rejected if it is infeasible or imprudent. *Id.* Here, the determination of whether the route is infeasible or imprudent is based on factors other than the route's impact on section 4(f) areas. *Louisiana Environmental,* 537 F.2d at 85–86.

■ 11. Applying these legal standards to the possible alternatives, the Secretary reasonably concluded that alternative 2A was the least harmful route alignment. The Secretary concluded that all the other alternatives to 2A either did not minimize harm or were imprudent. The 4(f) evaluation contains sufficiently detailed information such that the Secretary could employ the balancing process that considers the total harm caused by each alternative so that the option causing the least harm can be selected. *See* SFEIS VI–38 through VI–89.

12. Plaintiffs argue that the 4(f) analysis is faulty because the evaluation did not provide mitigation plans for each route alternative; the evaluation did not provide enough information to evaluate the relative harms; and the evaluation did not adequately assess "constructive takes." (Butler Testimony, July 13, 1998.) (A constructive take occurs where there is no actual physical taking of land but the proximity of the project substantially impairs the functioning of the park).

13. First, the Court cannot find support in law for the proposition that when evaluating all the alternatives, a mitigation plan must be produced for each. Once the least harmful alternative is chosen, then the mitigation plan furthers the goal of considering "all possible planning to minimize harm to the park." 23 U.S.C. § 138. Here, once 2A was chosen to be the least harmful alternative, an extensive mitigation plan was conceived. This plan calls for replacing the 10.1 acres of § 4(f) property from Waggoner Park with 62.1 acres

of replacement land; a recreation trail with amenities; revegetation and landscaping with a mix of quality native trees, shrubs, ground covers, and grasses; fishing ponds; and improvements to circulation roads and parking. TxDOT promised at the injunction hearing that this mitigation plan would be implemented before the highway was built. (Renfrow Testimony, July 14–15, 1998).

Second, Plaintiffs failed to prove that the Secretary was not provided with enough information to reasonably evaluate the alternative harms. Each alternative is discussed in the 4(f) evaluation with regard to noise impacts, neighborhood disruptions, inability to meet traffic demands, and construction costs. SFEIS, section VI–26 through VI–101. While some discussions are less detailed than others, this does not suggest that the Secretary's 4(f) determination should be overturned. Though there may be deficiencies in the Defendants' 4(f) processings (although the Court has discerned none), "even under the exacting Section 4(f) requirements, the judicial branch may not 'fly speck' if it appears in its review that all factors and standards were considered." *Louisiana Environmental Society, Inc. v. Dole,* 707 F.2d 116, 122–23 (5th Cir.1983).

Finally, Plaintiffs argue that the 4(f) statement failed to account for constructive takes of 4(f) resources, particularly to Mike Lewis Park. After reviewing the 4(f) evaluation, and the relevant expert testimony, the Court finds that the 2A alignment does not involve a constructive take of Mike Lewis Park, or any other 4(f) resource. To be established as a constructive take, an impact must substantially impair the function of a park, recreation area, waterfowl or wildlife refuge, or substantially impair the historic integrity of a historic site. 23 C.F.R. 771.135. Plaintiffs did not establish that the project will involve constructive takes of any protected properties. *See Citizen Advocates for Responsible Expansion, Inc. ("I–CARE"), v.*

*Dole,* 586 F.Supp. 1094, 1103 (N.D.Tex. 1984).

14. This Court concludes after careful review of the 4(f) evaluation that the Defendants' determination that 2A was the least harmful alternative after an informed comparison of the relative harms anticipated by the construction of the various other alignments was not arbitrary and capricious. *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814.

## ANALYSIS OF PUBLIC INVOLVEMENT

1. In 1985, the Court found that Defendants were not in compliance. *ACT I,* 610 F.Supp. at 1118.

2. The statute governing public hearing requirements for federal-aid highway projects is found at 23 U.S.C. § 128. In pertinent part it provides that

any State highway department which submits plans for a Federal-aid highway project . . . shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. . . .

3. The FHWA regulations implementing 23 U.S.C. § 128 which are applicable to this matter are found at 23 C.F.R. § 771.111(h) and the state regulations governing public involvement are found at 43 Tex.Admin.Code § 2.43 and 43 Tex.Admin.Code § 11.88.

4. A discussion of the Public Involvement Process for SH 161 is contained in the SFEIS at sections II–1 through II–12, VI–21, VII–1 through VII–38, and appendices R and S.

5. The SFEIS reveals that the SH 161 project has been open to public comment since 1969, with the proposals for the 2A alignment of SH 161 presented to the City Council by the City of Grand Prairie on February 13 and 20, and March 6 and 13, 1990. SFEIS at VII–4. The City Council adopted a resolution acknowledging support for SH 161 and Alternative 2A's route through C.P. Waggoner Park. SFEIS at VI–43.

6. The SFEIS also reveals that on October 15, 1994, after legal public notice was given, TxDOT conducted a public hearing to solicit written and verbal comments regarding the proposed route for SH 161. SFEIS, Appendix Q.

7. At the October 15, 1994 public hearing, the public was informed that the SFEIS design for SH 161 was based on a design year of 2015 and contemplated purchase of right of way for an 8 to 10 lane controlled access freeway. SFEIS, Appendix O.

8. Plaintiffs argue that because a new hearing was not held after the proposed project was changed from an 8 to 10 lane project to a 4 to 6 lane project, the hearings process for SH 161 violated 23 U.S.C. § 128 and Defendant TxDOT's regulations. (*See* Englert Testimony, July 13, 1998).

9. Defendants respond that at the public hearing, representatives of TxDOT pointed out that the regional transportation plan, Mobility 2010, recommended the construction of SH 161 as a freeway constructed in stages. Mobility 2010 shows SH 161 as a four to six lane freeway and this differs from the ultimate facility described during the public hearing because Mobility 2010 assesses the transportation needs through the year 2010 while the SFEIS and design plan for SH 161 is based on a design year of 2015. (Morris Testimony, July 14, 1998; Perge Testimony, July 15, 1998.)

10. A new hearing on a project should be afforded if "substantial" or "significant" changes have been made to the project since the last public hearing. *ACT I,* 610 F.Supp. at 1118. The Court is of the opinion that building the SH 161 project as a staged-constructed freeway does not substantially or significantly change the parameters of the project such that a new public hearing would be required.

The public was notified of the fact that the highway would be built in stages, initially as a 4 to 6 lane freeway and then ultimately as an 8 to 10 lane freeway. SFEIS, Appendix Q, Transcript at 50–51. Any new hearing on the 4 to 6 lane freeway expressed at the October 15, 1994 hearing. *D.C. Federation of Civic Associations, Inc. v. Volpe,* 316 F.Supp. 754, 779 (D.D.C. 1970), *rev'd on other grounds,* 459 F.2d 1231 (D.C.Cir.1971); *see also Ward v. Ackroyd,* 344 F.Supp. 1202, 1217–21 (D.Md. 1972).

11. Accordingly, the Court finds that the Defendants complied with federal and state requirements regarding public involvement for proposed SH 161.

### CONCLUSION

The necessity and location of a new highway is the exclusive province of federal and state administrative agencies, subject to Court review only for arbitrary and capricious actions. The Court's duty in this case is to determine whether Defendants have complied with the environmental laws and regulations relevant to the selection and building of SH 161, and to make certain that the agencies have considered the environmental consequences of their actions and informed the public of their research. The Court is satisfied that the Defendants have done so.

Accordingly, Defendants' Motion to Dissolve is **GRANTED,** and the Court's 1985 Injunction will be **DISSOLVED.**

Defendants will promptly submit a proposed Judgment.

SO ORDERED.