**STEWART PARK AND RESERVE CO-ALITION, INCORPORATED (SPARC); Orange County Federation of Sportsmen's Clubs, Inc.; and Sierra Club, Plaintiffs,**

v.

**Rodney E. SLATER, as United States Secretary of Transportation; United States Department of Transportation; Kenneth R. Wykle, as Administrator of the Federal Highway Administration; Harold J. Brown, as New York Division Administrator of the Federal Highway Administration; Federal Highway Administration; Louis R. Tomson, as Chairman of the New York State Thruway Authority; New York State Thruway Authority; Joseph H. Boardman, as Commissioner of the New York State Department of Transportation; and New York State Department of Transportation, Defendants.**

No. CIV.1:00–CV–1606(RFT).

United States District Court, N.D. New York.

Feb. 25, 2005.

Caffrey & Flower, John W. Caffry, of Counsel, Glens Fall, NY, Attorney for Plaintiffs.

Hon. Glenn T. Suddaby, Barbara D. Cottrell, Esq., Assistant United States Attorney, of Counsel, Albany, NY, United States Attorney for the Northern District of New York, Attorney for Federal Defendants.

Hon. Eliot Spitzer, Attorney General for the State of New York, New York State Department of Law, Environmental Protection Bureau, Lisa M. Burianek, Esq., Assistant Attorney General, of Counsel, Albany, NY, Attorney for State Defendants.

## MEMORANDUM–DECISION AND ORDER

TREECE, United States Magistrate Judge.

Plaintiffs initiated an action seeking a declaration that Defendants (collectively referred to as State and Federal Defendants) had violated various federal and state environmental and transportation laws in approving a proposed project to construct an interchange connecting an interstate highway with Stewart Airport. In 2002, this Court rendered two vital decisions with regard to this litigation. First, by a Memorandum–Decision and Order, dated September 30, 2002, this Court granted the Defendants' Motion for Summary Judgment, denied Plaintiffs' Cross Motion for Summary Judgment and entered a Judgment for the Defendants on all claims. *See Stewart Park and Reserve Coalition v. Slater (SPARC I)*, 225 F.Supp.2d 219 (N.D.N.Y.2002). Shortly thereafter, the Plaintiffs sought a Stay of the Enforcement of this Court's September 30, 2002 Judgment that would further bar Defendants from proceeding with the construction of the interchange until an appeal was considered by the Second Circuit. On November 21, 2002, this Court granted Plaintiffs' Motion for a Stay and further granted an Injunction pending Plaintiffs' appeal. *See Stewart Park and Reserve Coalition v. Slater (SPARC II)*, 232 F.Supp.2d 1 (N.D.N.Y.2002).

This case was appealed and the Second Circuit ultimately rendered a ruling which affirmed in part, reversed in part, and remanded the matter for further proceedings consistent with its decision. *See Stewart Park and Reserve Coalition v. Slater (SPARC III)*, 352 F.3d 545 (2d Cir. 2003). In remanding this case, the Second Circuit, in determining whether a Section 4(f) analysis [1] was required, stated that "the Defendants will have to determine whether (1) there are no prudent and feasible alternatives to using the Stewart Buffer Lands and the Crestview Lake Property for the interchange project, and (2)

1. 49 U.S.C. § 303(c).

whether the project includes all possible planning to minimize whatever harms will result to the Stewart Buffer Lands and the Crestview Lake Property." *Id.* at 557 (citing 49 U.S.C. § 303(c)).

Pursuant to the mandates of the Second Circuit, the State and Federal Defendants revisited their project, conducted an analysis, and based upon that analysis now seek an Order vacating the November 21, 2002 Injunction. *See* Dkt. Nos. 102 (Federal Defendants) & 103 (State Defendants).[2] Plaintiffs vigorously oppose the lifting of

the Stay and Injunction. *See* Dkt. Nos. 110–114.[3] Both the State and Federal Defendants replied to the Opposition (Dkt. Nos. 116 (Federal Defendants) & 117 (State Defendants)),[4] and oral arguments were held on February 11, 2005. Prior to oral arguments, this Court asked the parties to present enlarged and greater detailed maps which would show all of the relevant and controversial parcels of the Stewart Buffer Lands. The parties obliged and provided this Court with several maps and other memoranda in support of their various positions.[5] Based

2. The Federal Defendants' Motion to Vacate the Stay and the Injunction, designated as Dkt. No. 102, is composed of the Notice of Motion, an Affidavit of James C. Woods, Esq., dated June 23, 2004, with Exhibits 1–12, an Affidavit of David W. Nardone, dated June 22, 2004, and a Memorandum of Law. As for the State Defendants' Motion to Vacate the Stay and the Injunction, designated as Dkt. No. 103, this Motion is comprised of the Notice of Motion, an Affidavit of William Gorton, dated June 22, 2004 (Gorton I) with Exhibits 1–4, and a Memorandum of Law.

3. The Plaintiffs' Opposition Papers are as follows: (1) Affidavit of John M. Caffry, Esq., dated Sept. 22, 2004, with Exhibits 1–4 (Dkt. No. 110); (2) Exhibits 1 and 8 (Dkt. No. 111); (3) Exhibits 4, 6 & 7 (Dkt. No. 112); (4) Memorandum of Law (Dkt. No. 113); and (4) Affidavit of Stephen Gross, dated Sept. 23, 2004, with Exhibits A–F (Dkt. No. 114).

4. The Federal Defendants filed a Reply Memorandum of Law to the Plaintiffs' Opposition to their Motion to Vacate while the State Defendants filed a Reply Memorandum of Law, an Affidavit of William Gorton, dated Nov. 5, 2004 (Gorton II), and an Affidavit of Robert A. Herberger, dated Oct. 5, 2004, with Exhibits 1 & 2.

5. The Court introduced into the record several other documents to assist in understanding the facts and issues in this Motion. To distinguish these documents from those exhibits previously submitted with the pleadings and already docketed, the Court designated them as the Court's exhibits (Ct's Ex.). The documents are denoted as follows:

Ct's Ex. 1 A map of the entire Stewart Buffer Lands, which further notes the location of various venues within the lands, such as the location of Crestview Lake, the location of the wetland mitigation, the shale quarry reclamation site, and Stewart Airport Property. Furthermore, the sections of the map are color coded: (1) yellow reflects the borders of the Stewart State Forrest (5,265 acres); (2) light blue reflects the land located between Maple avenue, Drury lane, Rt. 207 and Rt. 84, belonging to NYSDOT but used for recreational purposes; (3) red reflects the Crestview Lake leased boundary; (4) dark blue reflects the Stewart Airport Property; and (5) purple reflects NYSDOT lands which the Defendants claim are not used for recreational purposes, although the Plaintiffs strongly contest that contention.

Ct's Ex. 2 A map of the East–West Connector Road and Drury Lane. The primary purpose for this map is to show where fill will be placed on wetlands and fresh water. Those wetland areas are indicated by a shaded area colored in with yellow. With regard to the freshwater area which will receive fill, located within the Crestview Lake Property, such body of water is reflected with a shaded area and a large yellow X.

Ct's Ex. 3 A map of the Drury Lane (Northern Portion) and I–84 Interchange. The primary purpose for this map is to indicate where fill will be placed on more wetlands. Those wetlands are reflected by a shaded area colored in with yellow.

Ct's Ex. 4 A map of Drury Lane (Southern Portion). The primary purpose for this

upon the Discussion below, this Court grants the Defendants' Motion to Vacate the November 21, 2002 Injunction.

## I. HISTORY AND FACTS

The undisputed facts were comprehensively cited by both this Court and the Second Circuit, *SPARC I*, 225 F.Supp.2d at 219 and *SPARC III*, 352 F.3d 545, respectively, thus familiarity with the facts is assumed. However, due to the complexity of this Motion to Vacate, we feel compelled to reiterate many of those facts as they may be relevant to the discussion and the adjudication of this present Motion. Nonetheless, in many respects the facts remain undisputed and it is only the contrary interpretation of those facts that causes this judicial review.

### A. Stewart Buffer Lands and Crestview Lake Property [6]

In 1969, the United States transferred ownership of the Stewart Air Force Base, which was approximately 1,552 acres, to the Metropolitan Transportation Authority ("MTA") with the expectation of creating another major airport to service the New York City metropolitan area. In 1971, with appropriate statutory authority, the New York State Department of Transportation ("NYSDOT") purchased and employed eminent domain to acquire 8,675 acres adjacent to Stewart Airport, now known as the "Stewart Buffer Lands," for airport expansion and transportation purposes. *See* Ct's Exs. 1 and 5 (maps of the entire Stewart Buffer Lands). In 1974, the MTA and the New York State Department of Environmental Conservation ("NYSDEC") executed a revocable management agreement to which NYSDEC would manage approximately 7,000 acres of the 8,675 acres comprising the Stewart Buffer Land for recreational uses such as hunting, fishing, hiking, and other outdoor activities. In accordance with the terms of

map is to indicate where fill will be placed on more wetlands. Those wetlands are reflected by a shaded area colored in with yellow.

Ct's Ex. 5 A map of Stewart Airport and the Stewart Buffer lands in 1971.

Ct's Ex. 6 A Fishing Guide To Stewart Airport Cooperative Area purportedly issued by NYSDEC which indicates the ponds located on NYSDOT property and administered by NYSDEC that provided fishing opportunities.

Ct's Ex. 7 A letter, dated March 3, 1998 and signed by Glenn M. Cole, Wildlife Manager, Region 3 of NYSDEC to Sandra Kissam, although not absolutely clear, in sum, noting SPARC concerns about the use of lands east of Drury Lane and the author sharing a similar view or perspective.

Ct's Ex. 8 Affidavit of Carmen Heitezman, dated February 10, 2005, stating, in sum, that hunting has occurred on lands east of Drury Lane.

Ct's Ex. 9 Affidavit of Jeffrey Kirk, dated February 10, 2005, stating, in sum, that he hunted on lands east of Drury Lane and between Crestview Lake and Route 207.

Ct's Ex. 10 Affidavit of Erven Hamilton, dated February 10, 2005, stating, in sum, that he hunted on lands east of Drury Lane.

Ct's Ex. 11 A NYSDEC memorandum dated, November 15, 2004, from Jason Denham to Bob Herberger identifying certain milkweed species. The sample submitted indicated common milkweed and not purple milkweed.

6. The Stewart Buffer Lands, also known as Stewart Properties are located

in the town of Hamptonburgh, Montgomery, Newburgh, and New Windsor in Orange County, New York. Generally speaking, they are bordered by Interstate Route 84 to the north, NYS Route 17K to the northeast, the New York State Thruway (Interstate Route 87) to the east, NYS Route 207, Forrester Road and NYS Route 208 to the south, and former Contrail lands to the west. The average north-south dimension of the site is approximately 2.5 miles and the average east-west dimension is approximately 6.5 miles.

*SPARC III*, 352 F.3d at 563 (Senior Circuit Judge Van Graafeland's Dissent).

the agreement, such recreational use could be terminated by NYSDOT with sixty days notice. This revocable management agreement and the area to which it refers have come to be known as the Cooperative Management Agreement and the Cooperative Hunting Area.[7] This Cooperative Management Agreement, in relevant part, states that

approximately 7000 acres of state lands to be used as a cooperative hunting and fishing area for hunters possessing New York State game and fish licenses. The area authorized for hunting and fishing will extend from Drury Lane westward to the boundary in the vicinity of Maybrook and to be bounded on the south by Route 207, Forrester Road, Highway 208 and to the north by Interstate Highway 84.

Dkt. No. 117, William Gorton, Aff., dated Oct. 5, 2004, at ¶ 3 ("Gorton II"); Robert A. Herberger Aff., dated Oct. 5, 2004, at ¶ 4, Exs. 1 & 2 (maps of the areas covered by the Cooperative Agreements); Ct's Ex. 1 (the 7,000 acres of recreational land is reflected by yellow and light blue borders).

Parenthetically, the Plaintiffs contend that the Cooperative Management Agreement also extended to properties east of Drury Lane, including, for example, Maroney's Pond. *See* Dkt. No. 117, Herberger Aff., at Ex. 2 (depicting the ponds). In support of their contention, Plaintiffs refer to NYSDEC's memoranda which seem to suggest that, in addition to the 7,000 acres, NYSDEC was managing property east of Drury Lane for the purpose of fishing. Ct's Exs. 6 & 7 (N.Y.SDEC's memos). Other nonparty individual as aver that they have either hunted or have seen others hunting on lands east of Drury Lane and south of Crestview Lake. Ct's Exs. 8–10 (affidavits of people who have hunted on lands east of Drury Lane); *see also supra* note 5.

In 1982, Stewart Airport, the Crestview Lake Property, and the Stewart Buffer Lands were transferred from MTA to NYSDOT, who chose to continue the Cooperative Management Agreement with NYSDEC. This revocable management agreement was extended by a 1983 Cooperative Management Agreement. With regard to the Crestview Lake Property, the Town of New Windsor entered into a revocable license agreement with NYSDOT that permitted the Town to operate this property as a recreational area until the airport is expanded.[8] However, this li-

---

7. Of this 7,000 acre domain, 5,265 acres were reserved as the Stewart State Forest which is managed by NYSDEC as a reforestation area pursuant to Environmental Conservation Law § 9–501. Dkt. No. 102, Ex. 1(4(f) Analysis) at Section III.A; see Ct's Ex. 1 (area reflected with yellow border). The balance of this domain, approximately 1,600 acres, continues under the jurisdiction of NYSDOT but is subject to the revocable management agreements with NYSDEC. *Id.* at Section III.B & Attach. ## 1, 4–6, & 10; Ct's Ex. 1 (this parcel of land is reflected by a light blue border).

8. Crestview Lake is actually divided into two bodies of water by a berm, also known as a causeway. These two bodies of waters have been commonly known, or distinguished from each other, as the Upper Crestview and Lower Crestview. Dkt. No. 102, Ex. 1, Attach. # 15, sheet 4 of 22; Ct's Exs. 1 & 2 (maps depicting the full Crestview Lake). Only the Lower Crestview Lake, also known as the Southern Crestview Lake, was used for recreational purposes. This portion of Crestview Lake is a 50 acre parcel of the original Stewart Airport, located approximately 3,000 feet south of Stewart Airport, which was managed by the Town of New Windsor pursuant to a revocable license that expired in 2002. Dkt. No. 102, Ex. 1, Attach. # 15. This area was, and presumably continues to be, used for boating, swimming, picnicking, beach and general recreational use. Dkt. No. 102, Ex. 1(4(f) Analysis) at Section III.C. On the other hand, the northern portion of Crestview lake, or the Upper Crestview, will be one of the sites where fill will be placed as a part of the

cense expired in April 2002. *Id.* Therefore, for more than thirty years, this 7,000 acre portion of the Stewart Buffer Land and the Crestview Lake Property was used for recreational purposes. In fact, NYSDEC adopted regulations for the use of the Stewart Buffer Lands entitled "Public Use in the Stewart Airport **Cooperator Area**" (emphasis added), *see* N.Y. COMP. CODES R. & REGS. tit. 6, pt. 92, which were reflected in agency brochures, and NYSDEC also issued annual reports on recreational usage levels. *See* Dkt. No. 117, Herberger Aff., & Ex. 1 (N.Y.SDEC brochure); N.Y. COMP. CODES R. & REGS. tit. 6, pt. 92.1 Applicability ("The provisions of this Part shall apply to the Stewart Airport Cooperator Area ('area'). The area shall extend from Drury Lane westward to the Conrail property and shall be bounded on the south by Route 207, Forrester Road and Highway 208 and to the north by Interstate Highway 84.").

In 1991, the New York State Legislature ("Legislature") directed the New York State Thruway Authority ("NYSTA") to acquire I–84, and title to a portion of I–84 was transferred to NYSTA in 1992. In order to provide direct access to Stewart Airport to help relieve traffic congestion, NYSDOT proposed a series of I–84 interchanges at Drury Lane, Barron Road, and Ridge Road. After a series of fits and starts with the development of this project, in 2000, the Final Environmental Impact Statement ("FEIS") was released and a preferred design was selected ("Project"). *SPARC I*, 225 F.Supp.2d at 225–26; *see also* Dkt. No. 113, Ex. 1 (FEIS).

### B. Previous Litigation

In 2000, immediately after the FEIS was released, the Plaintiffs commenced an action for declaratory and injunctive relief wherein they essential sought to stop the Project. The Plaintiffs amended their Complaint with the first cause of action alleging that Defendants violated Transportation Law Section 4(f) by failing to designate the Stewart Buffer Lands as a parkland protected by 4(f) and then failing to select a design which would comply with the statute. The other causes of action concerned other federal and state environmental statutes. Dkt. No. 2 (Am.Compl.).

In deciding the Motion for Summary Judgment in favor of the Defendants, this Court found, *inter alia,* that the 7,000 acre portion of the Stewart Buffer Lands was not a "parkland" within the purview of Section 4(f) because these lands had not been permanently designated as such or only had a temporary, revocable status as a wildlife area, and, based upon that finding, we held that Section 4(f) was not applicable. *SPARC I*, 225 F.Supp.2d at 227–30. Shortly thereafter, this Court issued a Stay of the Project's development until all matters were heard on appeal. *SPARC II*, 232 F.Supp.2d 1.

The Second Circuit did not adopt the Defendants' nor this Court's reasoning that a Section 4(f) analysis was not required due to the fact that these areas were not permanently designated as parklands. The Court of Appeals found much to the contrary. In their view, Section 4(f) should have been applied to both the Stewart Buffer Lands and the Crestview Lake Property even though "they were originally purchased for transportation purposes and were never permanently designated as parklands." *SPARC III*, 352 F.3d at 555. For the Second Circuit, these properties were used continuously and "exclusively as

wetland mitigation project and was not used for recreational purposes. *See* Dkt. No. 102,

Ex. 1, Attach. # 16, sheet 2 of 3; Ct's Ex. 2.

parklands for almost thirty years since they were acquired pursuant to a series of management agreements ... [which included ostensibly] ... the purposes of ... preserv[ing] and develop[ing] fish and wildlife resources of the state and improv[ing] access to them for recreational purposes." *Id.* This "uninterrupted and purposeful use by the public of the Stewart Buffer lands and the Crestview Lake Property for almost thirty years makes those lands a public park and recreational area of state and local significance within the meaning of Section 4(f)." *Id.* at 557. Moreover, the Second Circuit did not find within the plain language of Section 4(f) or its legislative history any limitation of its mandates to those areas that are "permanently" designated parklands and wildlife areas, and further found the Federal Defendants' interpretation of this statute as such to be unreasonable. *Id.* at 556. Based upon these findings, the Second Circuit remanded the litigation with the direction that the Defendants conduct the two prong analysis mandated by Section 4(f) and affirmed in all other respects the granting of Summary Judgment to the Defendants. *See id.* at 557–62.

## C. Defendants' Review and Analysis [9]

Both the State and Federal Defendants state that they have followed the instructions of the Second Circuit and performed further proceedings consistent with the Court of Appeal's opinion for the purpose of conducting the analysis required by Section 4(f). Both Defendants state that they undertook an analysis of the Project, assessed the requirements of Section 4(f) and other related state and federal regulations, and concluded that there are feasible and prudent modifications to the Project that would avoid the use of the protected lands.

After the issuance of *SPARC III*, NYS-DOT initially and independently reviewed the Second Circuit decision in the context of the Project's design, along with Section 4(f), and concluded that if they modified the Project and moved the road construction thirty feet east of Drury Lane, invariably, they would completely avoid any encroachments upon those lands they contend that the Second Circuit identified as being protected by Section 4(f)—the 7,000 acres under the Cooperative Management Agreements located on the west side of Drury Lane. Further, in the State Defendants' view, with there being no development nor encroachment of the Project onto the Crestview Lake Property, a fifty acre parcel of land deemed to be protected parklands, there would be no 4(f) impact at this site either. Thereafter, and as the next stage, NYSDOT and the Federal Highway Administration ("FHWA") jointly embarked upon a further review process.

As stated above, the Defendants reviewed Section 4(f), the corresponding rules and regulations, 23 C.F.R. § 771.01, *et seq.*, design procedure manuals and other governmental monograms with regard to the Project. Gorton I at ¶ 7. In January 2004, in addition to conferring between themselves, NYSDOT and FHWA met with NYSDEC, the Town of New Windsor, the County of Orange, and other governmental officials for the purpose of gathering detailed information about the recreational usage of the protected parklands. Groton I at ¶¶ 8, 9 & 14. After considerable research, Defendants jointly concluded that if they took the existing Drury Lane roadway section and moved this aspect of the Project, the proposed Drury Lane improvements, to the east by thirty feet, such would completely remove the Project and

---

9. In terms of what the Defendants' per-

formed, the essential facts are not in dispute.

the construction disturbance from the Stewart Buffer Lands, those protective lands located west of Drury Lane. Gorton I at ¶¶ 6–7, 9–11, 13 & 16; Dkt. No. 102, Ex. 1 at Section II; Ct's Ex. 1. By realigning Drury Lane, they would also avoid any encroachment upon the protected Crestview Lake recreational area. Groton I at ¶ 13; *see also* Dkt. No. 102, Ex. 1 at Sections III.C & V.C. With this realignment, the remaining facet of the Project, the East–West Connector to "C" street and the Drury Lane and I–84 connections will occur on the Stewart Airport Land east of Drury Lane, except an aspect of the wetland mitigation component of the construction would occur in the Stewart State Forrest. Dkt. No. 102, Ex. 1; Ct's Exs. 1 & 2. Accordingly, the Defendants have explicitly taken the position that no lands located east of Drury Lane are protected parklands. Furthermore, there were no identified changes to the FEIS, except a possible reduction to environmental impacts, which has been previously accepted by the reviewing courts.[10] Gorton I at ¶ 12.

Continuing with their analysis, the Defendants reviewed the modified Project, as required by FHWA's regulations located at 23 C.F.R. § 771.01 *et seq,* to determine if there was any potential for secondary and indirect impacts, also known as "constructive use," to these lands. FHWA considered noise, aesthetics, access, vibrations and ecological intrusions to determine if there were substantial impairments to the protected parklands. Dkt. No. 102, David W. Nardone Aff., dated June 22, 2004, at ¶ 6; Dkt. No. 102, Ex.1 Section V.D. i-v. Based upon their analysis, Defendants concluded that there were no secondary nor indirect impacts (constructive use pursuant to 23 C.F.R. Part 771.135) upon the lands in question. Gorton I at ¶ 14.

As a part of the original and the current Project, NYSDOT is to conduct wetland mitigation within the Stewart State Forest and further reclaim a contiguous quarry with the excavated soil. Dkt. No. 102, Ex. 1 at Sections II, III.A, & V.A; Ct's Ex. 1 (noting the wetland mitigation site and the shale quarry reclamation site which is shaded green). In March 1999, when it transferred Stewart Properties west of Maple Avenue to NYSDEC, NYSDOT reserved the right to perform wetland mitigation:

> The Department of Transportation has indicated that subject to the following uses and/or exceptions, the identified lands are excess needs of the Stewart International Airport.... Wetland creation and/or enhancement as mitigation for wetlands impacts of Department of Transportation and Airport projects.

The Project requires wetland mitigation because fill must be placed in approximately 5.35 acres of wetlands and 1.87 acres of open water in order to further the construction. Gorton II at Ex. 5. The placing of the fill is to occur in the southern portion of the Upper Crestview Lake and intermittent wetlands along the eastside of Drury Lane. *See* Ct's Exs. 2 & 3 (wetlands to be filled are shaded and colored yellow). This wetland mitigation was approved by NYSDEC and the United States Corp of Engineers ("CORP") and permits to complete such work were issued. Gorton II at ¶¶ 10–12, & Ex. 5, CORP's Permit, dated Oct. 22, 2002.[11] After examining the entire

---

10. This 4(f) Analysis concludes that there are no changes in the air and noise impact nor traffic volume as presented in the FEIS. Dkt. No. 102, Ex. 1 at Sections V.B & C.

11. NYSDEC and CORP's joint permit states in pertinent part:
 The following work is authorized by this permit: The discharge of clean fill material

9,000 acres of state land, the restoration aspect of the wetland mitigation project, selected by NYSDOT, NYSDEC, CORP, and NYSTA, will consist of expanding a small wetland in the far western part of the Stewart State Forrest, described as a drainage swale, which is also an active hayfield, with limited habitat, where farmers have authorization to cut the hay seasonally, and reusing the excavated soil to reclaim an abandoned shale quarry to create a vegetated meadow. Dkt. No. 102, Ex. 1 Section V.A; Gorton II at Ex. 5; Herberger Aff. at ¶ 8; Ct's Ex. 1. Therefore approximately 13 new acres of wetlands, 2 acres of open water and 1. 37 acres of vernal pools will be established as mitigation for the gravel and soil discharge on existing wetlands. The excavation of soil is necessary to attain the proper elevations to support the wetland system and the excess soil was requested by NYSDEC in order to level the piles of uneven shale outcroppings, which currently do not support any vegetation, at a 1.4 acre quarry site off of Barron Road. Gorton II at ¶ 11; Dkt. No. 102, Ex. 1 & Attach. # 16; Ct's Ex. 1. The Defendants argue that this realignment of Drury Lane and the East–West Connector to "C" Street will have a slight reduction on the adverse environmental impacts on the wetland mitigation aspect of the Project as evaluated in the FEIS, would not create other significant environmental impacts, and moreover, may enhance its aesthetics and recreational use. Gorton I at ¶¶ 12–18; Dkt. No. 102, Ex. 1 at Section V.A.

During the course of NYSDEC and the CORP's permit review, there were public notices and comments, public hearings and interagency review on both the state and federal levels. In conjunction with the permit review, there were reviews by NYSDOT, NYSDEC, and the United States Department of the Interior's Fish and Wildlife Services, of the existing and proposed endangered and threatened species on these protected lands of which none were found. Gorton II at ¶¶ 11–14.

In order to complete the wetland mitigation, some aspects of the construction would occur on 4(f) property. In this respect, NYSDOT and FHWA found that this aspect of the Project would amount to nothing more than a temporary occupancy of the land and thus did not fall within the purview of Section 4(f). Gorton II at ¶¶ 6–8; Dkt. No. 102, Ex. 1 at Sections VIII–X; see also 23 C.F.R. Part 771.135. All of these analyses, as stated above, are considered, in total, to constitute the Defendants' 4(f) review (hereinafter "4(f) Analysis or Review"). Dkt. No. 102, Ex. 1.

After further regional reviews, on April 19, 2004, the 4(f) Analysis was signed by NYSDOT, which was submitted to FHWA for its approval. FHWA approved the Analysis one day later. Gorton I at ¶ 15. In sum, the Defendants now argue that the adjustment to Drury Lane, in their professional analysis and discretion, would entirely avoid the Stewart Buffer Lands west of Drury Lane. With there being no actual or constructive use of the parklands

---

into approximately 7.22 acres of waters of the United States, including approximately 5.35 acres of wetlands, to construct a new interchange at the intersection of Interstate 84 and Drury Lane; the reconfiguration of Drury Lane; and the construction of a new road between Drury Lane and the existing passenger terminal at Stewart International Airport. Approximately 13 acres of wetland, 2 acres of open water and 1.37 acres

of vernal pools [will be] established as mitigation for the discharge.

The permittee [NYSTA] shall insure that all excess fill material is removed from the project site and disposed of in upland areas. This excess material shall be stabilized as soon as possible to prevent it from reentering any waters of the United States including wetlands.

Gorton II, Ex. 5.

by NYSDEC and FHWA, the Defendants conclude that no additional environmental documentation is required, and, in their considered view, they had complied with Section 4(f) and the dictates of the Second Circuit. *See* Dkt. No. 102, Ex. 1(4(f) Analysis) at Section I. Since there is no "use" of the 4(f) land identified by the Second Circuit, in light of the fact that Defendants have created a feasible and prudent alternative to using such protected lands, the Defendants claim that they have complied with the law. Nardone at ¶7; Dkt. No. 102, Ex. 1 at Section X. As such, they argue that the Injunction should now be lifted.

## II. DISCUSSION

In order to grant a motion to vacate an injunction, this Court must determine if the Defendants have properly performed their obligations under the injunction. *Ass'n. Concerned About Tomorrow, Inc., v. Slater, et al.*, 40 F.Supp.2d 823 (N.D.Tex. 1998). Thus, we must determine if the Defendants have met their obligation, that is to conduct a Section 4(f) analysis, as mandated by the Second Circuit. *SPARC III*, 352 F.3d at 557.

### A. Administrative Agency Review

The Second Circuit disagreed with the standard of review previously applied by this Court when we concluded that the Stewart Buffer Lands were not parklands and, therefore, the Defendants did not have to conduct an 4(f) review. At the time of that Decision and Order, we employed the arbitrary and capricious standard of review, found in 5 U.S.C. § 706, to the Federal Defendants' determination that they did not need to meet the requirements of Section 4(f) and we assessed whether their decision was "wholly unreasonable or they failed to follow the necessary procedural requirement." *SPARC*

*III*, 352 F.3d at 554 (citing *SPARC I*, 225 F.Supp.2d at 227). The Court of Appeals observed that the employment of the arbitrary and capricious standard of review may have been precipitous or premature and our review of the Secretary of Transportation's decisions and actions was erroneously applied. Since the Federal Defendants based their decision that they did not have to perform a Section 4(f) analysis on a faulty interpretation of the statute and misconstruction of their rules and regulations, the Second Circuit ruled that they were not entitled to judicial deference, and, thus, the arbitrary and capricious standard was inapplicable. *Id.*

Now pending before is Court, as directed by the Second Circuit, is yet another analysis which the Defendants represent complies with the two prong analysis of Section 4(f). 49 U.S.C. § 303. If their assessment is accurate, then our review of their analysis is a review of an agency decision and, therefore, is governed by the Administrative Procedure Act ("APA"). *Sierra Club v. United States Army Corps of Eng'rs*, 772 F.2d 1043, 1050 (2d Cir. 1985) (ruling that the APA governs judicial review of an agency's compliance with the National Environmental Policy Act (NEPA)); 5 U.S.C. § 706. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, ... [or] without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A)-(D); *see Citizens to Preserve Overton Park, Inc. v. Volpe.*, 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *SPARC III*, 352 F.3d at 554. Although an agency is entitled to a presumption of "regularity," that presumption will not shield the agency from a thorough, probing, in-depth review by the court. *Overton Park v. Volpe*, 401 U.S. at 414, 91 S.Ct. 814 (citations

omitted); *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 699 (2d Cir.1972). Stated another way, the courts should not automatically defer to an agency "without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—lack of significance—of the [ ] information" and "whether there has been a clear error of judgment." *Senville v. Peters,* 327 F.Supp.2d 335, 344–45 (D.Vt. 2004) [12] (quoting *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)); *see also SPARC I,* 225 F.Supp.2d at 227 (citing, *inter alia, State of New York Dep't of Social Servs. v. Shalala,* 21 F.3d 485, 492 (2d Cir.1994)).

### B. 49 U.S.C. § 303—Section 4(f) of the Transportation Law

Before considering any federal or state transportation project, the Secretary of Transportation ["Secretary"] is statutorily mandated to be cognizant of "the United States Government [policy] that special effort be made to preserve the natural beauty of . . . public park and recreational lands, wildlife and waterfowl refuges, and historical sites." *SPARC III,* 352 F.3d at 555 (citing 49 U.S.C. § 303(a)). In complying with that policy, the Secretary must coordinate and consult with the Departments of the Interior, Housing and Urban Development, Agriculture and with the states to develop transportation plans that "include measures to maintain or enhance the natural beauty of lands," which may be crossed or used as a result of transportation activities. 49 U.S.C. § 303(b). To that end, if a transportation project crosses or uses a parkland, recreational lands, or wildlife preserves, the Secretary may approve such program after completing a two prong analysis. This statutory requirement states:

> The Secretary may approve a transportation program or project [other than any project for a park road or parkway under section 204 of title 23] requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if—
>
> (1) there is no prudent and feasible alternative to using that land; and
>
> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303.

Section 4(f), "which is a clear and specific directive," prohibits the Secretary from using federal funds to finance the construction of highways through public parks if a "feasible and prudent" alternative route exists, and, if no such route is available, construction through a park may occur only if there has been "all possible planning to minimize harm" to the park. In essence, the statute is "a plain and explicit bar to the use of federal funds for construction of highways through parks— only the most unusual situations are exempted." *Overton Park, Inc. v. Volpe,* 401

---

12. In *Senville v. Peters,* it was noted that within the Second Circuit this judicial review has two steps: (1) whether the agency took a "hard look at the possible effects of the proposed action"; and (2) if the court is satisfied that the agency took a hard look, then the court must determine if the agency decision was arbitrary and capricious. 327 F.Supp.2d at 345 (quoting *Vill. of Grand View v. Skinner,* 947 F.2d 651, 657 (2d Cir.1991)).

U.S. at 411, 91 S.Ct. 814; *see also Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d at 699. A prudent and feasible alternative to using parkland is one that is "compatible with sound engineering" and one that does not impose "cost or community disruption [that] would reach extraordinary magnitudes." *Ass'n. Concerned About Tomorrow, Inc. (ACT) v. Slater*, 40 F.Supp.2d at 833 (citing *Overton Park v. Volpe*, 401 U.S. at 411 & 412–13, 91 S.Ct. 814).

Here, the Defendants represent, after being mandated to do so by the Second Circuit, that they have, in effect, conducted a Section 4(f) analysis, and, based upon their review of the previous Project plans, the statute and corresponding rules and regulations and consultations with various state and federal agencies, they have modified said Project to create a feasible and prudent alternative to using a portion of the Stewart Buffer Lands designated for recreational use. That modification is to move the planned four lane improvements of Drury Lane thirty feet east of the existing Drury Lane thereby completely avoiding any use of designated "parklands" located west of Drury Lane. Furthermore, the original Project did not intend on using any of the lands located within the protected Crestview Lake Property, therefore, the realignment to Drury Lane would not alter nor impact those intentions in any way. The Defendants also found that there are no purposeful and uninterrupted recreational use of the lands east of Drury Lane. In fact, the Defendants argue that this modified Project slightly reduces those environmental impacts identified in the FEIS, while at the same time avoids the use of public parklands. However, the Project continues to include wetland mitigation construction within the Stewart State Forest as provided by the 1999 land transfer agreement between NYSDOT and NYSDEC. On April 19 and 20, 2004,

based upon this avoidance modification of moving Drury Lane east thirty feet, both NYSDOT and FHWA concluded that a Section 4(f) determination was inapplicable. Dkt. No. 102, Ex. 1.

Plaintiffs categorically challenge the Defendants' 4(f) Analysis—an approach that concludes that a full fledged 4(f) analysis is inapplicable and not warranted—by asserting that their "Analysis" does not comply with the Second Circuit's directives, charging that it does not constitute a valid or proper Section 4(f) review, and concluding that the findings therein are either essentially erroneous, or in reality, not supported by the facts.

## C. The Defendants' 4(f) Review

Plaintiffs insist that, notwithstanding the Defendants' modifications, the Project encroaches on protected parklands. As such Plaintiffs assert, *inter alia*, that the Defendants have failed to determine whether there are alternatives that would avoid the use of protected parklands. In the Plaintiffs' view, since the redesigned Project does not avoid the use of parklands as contended by the Defendants in that the parklands are impacted either permanently or adversely by the road construction, there is a use and as such the Defendants have failed in their duties as prescribed by Section 4(f). Lastly, the Plaintiffs argue that the mitigation proposal of constructing on wetlands in the Stewart Park Lands constitutes a use under Section 4(f), and any secondary development resulting from the construction constitutes a constructive use of the protected lands.

### 1. Protected Parklands

The first thrust, and probably the essential argument propounded by the Plaintiffs, is that the redesigned Project does in fact impact upon the lands located to the

east of Drury Lane, which in their estimation, are also protected parklands. The Plaintiffs maintain that the Second Circuit in *SPARC III* found the entire 8,675 acres of the Stewart Buffer Land, not just the 7,000 acres west of Drury Lane, to be protected parklands. Under this critique, the 1,200 acres located east of Drury Lane are also considered to be protected parklands. Characterizing the Plaintiffs' reading of *SPARC III* as "overly zealous," the Defendants disagree with this contention stating that the 1,200 acre area was excluded from being used for recreational purposes, a position the Court finds to be more reasonable and in accord with this Court's and the Second Circuit's previous decisions.

In addressing whether any or all of the Stewart Buffer Lands or the protected Crestview Lake Property was designated as a public park or recreational area, this Court previously found, which was undisputed at the time, that:

> [i]n 1971, the MTA became the owner of approximately 8,675 acres that became known as the Stewart Buffer Lands. In 1974, the MTA agreed to permit approximately 7,000 acres to be used for hunting, trapping and fishing. This land became known as the Stewart Airport Cooperative Hunting Area to be managed by NYSDEC. *See* Docket No. 51, Exs. 4 & 29. In 1982, ownership of the Stewart Buffer Lands was transferred to NYSDOT. In 1983, the NYSDOT continued the cooperative agreement with NYSDEC pursuant to N.Y. Envtl. Conserv. Law § 11–0501. *Id.* at Ex. 1. **From 1974 to the present, the Stewart Airport Cooperative Hunting Area has been widely used for hunting, trapping and fishing.** *See id.* at Ex. 11.

*SPARC I,* 225 F.Supp.2d at 227–28 (emphasis added).

Similarly, the Second Circuit found the same set of facts, that is, it was the Cooperative Agreements which granted to NYSDEC management over 7,000 acres of the Stewart Buffer Land and "permitted interim use ... for hunting, fishing, hiking, and other outdoor activities." *SPARC III,* 352 F.3d at 550. This established parkland, the 7,000 acres, as well as Crestview Lake Property, was "used exclusively for almost [an uninterrupted and purposeful] thirty years since [it] **was acquired pursuant to a series of management agreements.**" *Id.* at 555 & 557 (emphasis added). To be more precise on these facts, all we need to do is turn to the Cooperative Agreements themselves to be advised what portion of the Stewart Buffer Land became the established parkland. The Agreement makes explicitly clear that "approximately 7000 acres of state lands to be used as a cooperative hunting and fishing area ... will extend from Drury Lane westward to the boundary in the vicinity of Maybrook and to be bounded on the south by Route 207, Forrester Road, Highway 208 and to the north by Interstate Highway 84." Gorton II at ¶ 3; *see also* N.Y. Comp. Codes R. & Regs. tit. 6, pt. 92.1. Neither the 1974 nor the 1983 Cooperative Agreements cover more territory than this 7,000 acre area. Although the Second Circuit may have referred to this 7,000 acres as the Stewart Buffer Land, when it wrote that "it cannot be gainsaid that the Stewart Buffer Lands and the Crestview Lake Property were established parklands," the Court of Appeals did not, by any stretch, intend to suggest that we were dealing with the entire 8,675 acres as the parkland. *SPARC III,* 352 F.3d at 555.[13]

---

**13.** The Court of Appeals' employment of the term "Stewart Buffer Lands" is quite understandable when you consider that the parties themselves have not always been so precise

The Defendants remain steadfast on this issue: that the 1,200 acres located east of Drury Lane was not and is not protected parklands. But the Plaintiffs submitted purportedly additional proof that the 1,200 acres located east of Drury Lane was and is used for recreational use. The crux of this additional proof can be found in two NYSDEC memoranda and several affidavits submitted at oral argument. *See supra* note 5. The first memorandum, entitled *Fishing Guide To Stewart Airport Cooperative Area, N.Y.S. Department of Environmental Conservation, Region 3*, identifies four ponds (Tenny's, Maroney's, Rowe's, and Wilken's) where fishing opportunities may occur on "Stewart Airport Cooperative Area." Ct's Ex. 6. Three of the named ponds are found west of Drury Lane and one only, Maroney's, is located approximately one-half mile south of the intersection of Drury Lane and Route 84. Herberger Aff. at Ex. 2 (map of Stewart State Forest); Ct's Ex. 1 (purple color bordered area where Maroney's Pond is located). Maroney's Pond is not specifically identified in the Cooperative Agreements, however, fishing on the pond is apparently regulated pursuant to NYSDEC's regulations. N.Y. COMP. CODES R. & REGS. tit. 6, pt. 92.4(a)(4). Notably, the road construction will not use any part of Maroney's Pond nor interfere with the enjoyment of it.

Next, in support of the proposition that the lands east of Drury Lane are protected parklands is a letter, dated December 3, 1998, from Glen Cole, a wildlife manager, to Sandra Kissam, Vice President of Sierra Club, which states, in sum and substance, "the concerns that SPARC has for the use of lands east of Drury Lane are shared by this office and we would like to assure that public use for enjoyment of the fish and wildlife resources of the area are maintained and perpetuated." Ct's Ex. 7. Without a more lucid context for this letter, it is difficult for this Court to discern whether the author, the recipient and/or others simply agree on a notion of wildlife resources in this location or if this is a confirmation that the land east of Drury Lane were in fact an established wildlife resource, formally managed by NYSDEC. Once again, we note that this land was not under the control of NYSDEC but rather owned by NYSDOT nor is it described or identified in the Cooperative Agreements. Ct's Ex. 1. There is no other document, similar in force as the Cooperative Agreements, which establishes NYSDEC's command over this area similar to the authority granted to them by NYSDOT in 1974 and 1983. *See* Herberger Aff. at Ex. 1 (N.Y.SDEC guide to Stewart State Forest). In fact, there is no reference in NYSDEC's rules and regulations regarding hunting on this land east of Drury Lane similar to the rules and regulations established for fishing on ponds, particularly Maroney's Pond, which would attest to that land being considered more definitively as protected parkland. *Compare* N.Y. COMP. CODES R. & REGS. tit. 6, Parts 92.4 (fishing regulations) & 92.5 (hunting regulations); *also see* N.Y. COMP. CODES R. & REGS. tit. 6, pt. 92.1 (defining the applicable area as Stewart Cooperative Area where hunting is to occur).

The same problem plagues the affidavits submitted by Plaintiffs in which the affiants state that they have either hunted or witnessed hunters on lands east of Drury

---

when describing what lands constitute recreational use. There were times, and I suspect even before the Second Circuit, when the parties refer to the Stewart State Forest as the 7,000 acre Cooperative Hunting Area or as the Stewart Buffer Lands, when in fact the Stewart State Forest only includes 5,265 acres and is concurrently a part of both the Stewart Buffer Lands and the Cooperative Hunting Area.

Lane, in the area between Crestview Lake and Route 207, and near and/or on airport grounds. Ct's Exs. 9–11; *see also* Ct's Ex. 1 (property indicated with purple and blue borders). The central core of this proof to bolster Plaintiffs' opaque theory that these are protected lands is an overly broad application of the doctrine of adverse possession. In their view, if recreational use occurs on the land, notwithstanding lack of governmental sanction or vagaries as to governmental approval, it still constitutes "use" and, *a fortiori*, establishes protected lands. Defendants strongly dispute Plaintiffs' declarations, both as to the facts and the law, as an illogical and ill-suited application of the adverse possession doctrine. If the Plaintiffs wish to rely upon an illusory adoption of adverse possession, Defendants postulate that the Plaintiffs must also consider the doctrine's indispensable elements of "open and notorious" use and not a patchwork of estimations and guesses in order to declare this land protected. This *defacto* recreational use of NYSDOT property, unlike the Cooperative Area, is not "an established recreational facility and refuge." *SPARC III*, 352 F.3d at 555 (citing S.Rep. No. 89–1659, at 6 (1966)). In order for such lands to be considered a recreational area, it must have been "officially designated as such" and recreational use determined as "a major purpose;" "incidental, secondary, occasional or dispersed recreational activities do not constitute a major purpose." Federal Highway Administration, Section 4(f) Policy Paper (revised June 7, 1989) (cited in *SPARC III*,

352 F.3d at 556). In addition to arguing that this parcel of land never had the major purpose of recreation, Defendants also proclaim that there is no "uninterrupted and purposeful use" of this property as recreation in the same vein as the 7,000 acres set aside exactly for that purpose.

■ The 1,200 acre area east of Drury lane is outside the scope of the Cooperative Agreements, is not an established recreational refuge and any recreational use was not a major purpose but rather incidental. Therefore, it was never meant to be the subject of a 4(f) review by this Court or the Second Circuit. Gorton II at ¶ 3 (citing sources omitted). Accordingly, the only parkland in issue is the 7,000 acres west of Drury Lane, which encompasses the 5,265 acres known as the Stewart State Forest. *See supra* p. 90 (Second Circuit's finding of an uninterrupted and purposeful use for thirty years).

Section 4(f) requires the Secretary of Transportation to avoid highway projects that impact protected lands, or to spend federal funds on such projects, and to evaluate feasible and prudent alternatives before using the protected land. Since the redesigned Project does not encroach upon either the 7,000 acres west of Drury Lane or the 50 acres of Crestview Lake Property, there is no use as defined by Section 4(f) and the corresponding regulations. Therefore, the realignment then is a feasible and prudent alternative to using the "parklands." [14] In this respect, the Defen-

14. The Plaintiffs suggest that they have a feasible and prudent alternative to using the land, which has been denoted as alternative project 5(a), and we may accept, *arguendo*, that the Plaintiffs' plan may be a more perfect plan in terms of avoiding the use of parklands. Dkt. No. 114, Stephen Gross Aff. at ¶¶ 19–35. Yet, it is not the province of this Court to analyze the various and competing construction proposals and choose between the best of the

these plans. The Court resists considering such a task notwithstanding the implicit invitation to do so by the Plaintiffs. That responsibility lies with the Secretary of Transportation, who must be guided by law. Neither the statute nor the regulations mandate that the Secretary of Transportation must approve the most perfect plan. Rather the Secretary is only required to find a prudent and feasible alternative to the use, which is based upon

dants have met the first prong of the mandated review, and if there is no use of parkland, then the demonstrable need for a further 4(f) review, particularly considering the second prong of the review, is obviated, at least in this context. However, the Court is not prepared, at this point, to say that the Defendants' did not conduct a full 4(f) review and we must weigh the Project against both mandated inquiries.

## 2. Wetland Mitigation

In the Plaintiffs' view, the wetland mitigation construction aspect of the Project will use 15 acres of protected parkland and, thus, for purposes of Section 4(f), must be subjected to a review. No matter how "benign, beneficial or *de minimis*" the plan may be, the Plaintiffs argue that it still remains a use of parklands for the purposes of being incorporated into a transportation facility and will cause harm to the sensitive ecology of this site. The Defendants, however, refute that the wetland mitigation is a Section 4(f) use requiring a full blown review. What they envision for this wetland mitigation would not be an adverse impact to the recreational area, but rather, an expansion and enhancement of the existing wetlands. To appreciate this debate as to "use," we should turn 23 C.F.R. § 771.135(p)(1) which reads as follows:

> Except as set forth in paragraphs (f), (g)(2), and (h) of this section, "use" (in paragraph (a)(1) of this section) occurs:
>
> (i) When land is permanently incorporated into a transportation facility;
>
> (ii) When there is a temporary occupancy of land that is adverse in terms of the statute's preservationist purposes as de-

termined by the criteria in paragraph (p)(7) of this section; or

(iii) When there is a constructive use of land.

(2) Constructive use occurs when the transportation project does not incorporate land from a section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the resource are substantially diminished.

(3) The Administration is not required to determine that there is no constructive use. However, such a determination could be made at the discretion of the Administration.

■ "To be established as a constructive tak[ing], an impact must substantially impair the function of a park, recreation area, waterfowl or wildlife refuge, or substantially impair the historic integrity of a historic site." *Ass'n. Concerned About Tomorrow, Inc. (ACT) v. Slater*, 40 F.Supp.2d 823, 835–36 (N.D.Tex.1998).

As stated above, in March 1999, when NYSDOT transferred the Stewart Properties located west of Maple Avenue to NYS-DEC, it reserved the right to perform wetland mitigation in Stewart State Forrest near Barron Road. Herberger Aff. at ¶ 6. Wetland mitigation is required in order to place fill in approximately 5.35 acres of wetlands and 1.87 acres of open water in order to further construction. These sites are located predominately east of Drury Lane with a couple located immediately west of this road, and a portion of the

---

sound engineering principles, before it can contemplate using publicly owned land of a public park. By not accepting the invitation to select the better plan, the Court is not,

however, abandoning its obligation to conduct a probing review of the Defendants' 4(f) Analysis.

Upper Crestview Lake, which had not been the subject of a recreational use lease with the Town of Windsor. Ct's Exs. 2 & 3. After a public hearing and a joint administrative process, this wetland mitigation was approved by receiving permits from NYSDEC and the CORP. Gorton II at ¶¶ 10–12, & Ex. 5, CORP's Permit, dated Oct. 22, 2002; Herberger Aff. at ¶ 6; see also supra note 11. Additionally, there is a Use & Occupancy Agreement which contains all of the steps to be taken to avoid and minimize harm during the construction. Dkt. No. 102, Ex. 1, Section IX & Attach. # 17.[15] The wetland mitigation aspect of the Project will expand an existing small wetland in the Stewart State Forrest, which is also an active hayfield where farmers have authorization to cut the hay seasonally, into approximately 13 acres of wetlands, 2 acres of open water and 1.37 acres of vernal pools as mitigation for the gravel and soil filling of the existing wetlands. The excavation of soil is necessary to attain the proper elevations to support the wetland system and the excess excavated soil was requested by NYSDEC to help reclaim an abandoned shale quarry, a 1.4 acre site off of Barron Road, and create a vegetated meadow. Gorton II at ¶ 11; Ct's Ex 1. Furthermore, we cannot ignore the fact the wetland area is being administered by another agency, the CORP, who has jurisdiction over these types of bodies of water and can permit a plan that can accomplish compensatory mitigation for the land to receive fill discharge.

■ But the point of matter is this, the Defendants conducted a 4(f) review of this aspect of the Project and determined that the work being contemplated did not amount to a "use" of the land. In their analysis, what was being proposed may at best rise to the level of a temporary use, in that, in order to complete the wetland mitigation, some aspects of the construction would occur on 4(f) property. In this respect, NYSDOT and FHWA found that this facet of the Project would amount to nothing more than a temporary occupancy of the land and, thus, did not fall within the purview of Section 4(f). Gorton II at ¶¶ 6–8; Dkt. No. 102, Ex. 1 at Sections VIII–X; see also 23 C.F.R. Part 771.135. There were reviews by NYSDOT, NYSDEC, and the United States Department of the Interior's Fish and Wildlife Services with regard to existing and proposed endangered and threatened species of which none were found. Gorton II at ¶¶ 11–14.[16] We find, that all of these decisions and actions, which constitute the Defendants' 4(f) Analysis, are not unreasonable.

15. In response to Plaintiffs' request for documents, the Defendants contend that the Plaintiffs participated in the aforesaid hearings, did not challenge the issuance of the wetland permit, and have waived any challenge to those permits. Dkt. No. 110, Ex. 2, at ¶ 28.

16. Plaintiffs claim that the purple milkweed or the meadow butterfly would be imperiled if this realignment and wetland mitigation were permitted. Dkt. No. 114, Gross Aff. at ¶¶ 16–18; J.G. Barbour's Report and Resume (Ex. B & C); John Yrizarry's Report, dated July 2004 (Ex. D). Defendants initially challenge this claim by stating that this is clearly not a 4(f) review issue but, rather, an environmental review issue, which had already been decided by the courts in their favor. Gorton II at ¶¶ 13 & 14. But more significantly, the Defendants assert that neither the purple milkweed nor the meadow butterfly are protected species nor native plants. Id. at ¶ 13. (citing 6 N.Y.Comp. Codes R. & Regs., pts. 182.6 & 193.3; Ct's Ex. 11). If such species and habitats were endangered, the Defendants remark that such would have been included in the wetland review process. Id. at 14. To that end, this Court has already found that the "Stewart Buffer Lands are not home to any endangered species." SPARC I, 225 F.Supp.2d at 228.

If, *arguendo,* this wetland mitigation constituted a taking, nonetheless, the Defendants may still be in a position to continue their plans. However, under such a scenario, the Defendants would have to minimize the harm, as mandated by the second prong of the 4(f) requirements. 49 U.S.C. § 303. Before there can be a taking for transportation purpose, as a condition precedent, FHWA has an affirmative duty to minimize the damage to the parklands. Stated another way, "the Secretary must withhold his approval unless and until he is satisfied that there has been, in the words of the statute, 'all possible planning to minimize harm to such park ...,' and that full implementation of such planning to minimize is an obligated condition of the project." *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d at 701 (citation omitted). If, however, the taking does not rise to the level of being permanently incorporated into the transportation facility, a permanent impairment by the use is still required in order to constitute a violation of Section 4(f):

> And, the word "use" in the statute refers to a use that is *adverse* in terms of the statute's preservationist purposes, a "use" that might *"harm"* the resources the statute seeks to protect, 49 U.S.C. § 303(c)(2) (emphasis added). *See Adler v. Lewis,* 675 F.2d 1085, 1092 (9th Cir. 1982) ("the term 'use' is ... not limited to the concept of physical taking, but includes areas that are significantly, adversely affected by the project"); *D.C. Federation of Civic Associations v. Volpe,* 459 F.2d 1231, 1239 (D.C.Cir.) ("harm" to recreational park under § 4(f) encompasses "noise, air pollution and general unsightliness" that might "dissipate its aesthetic value, crush its wildlife [or] defoliate its vegetation") *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972); *Nashvillians Against I–440 v. Lewis,* 524 F.Supp.

962, 976 (M.D.Tenn.1981) (constructive "use" of historic property under § 4(f) occurs only where "the claimed harm will affect the *historic* value or quality of the properties" and where "the purposes for which such properties are protected [are] threatened by the 'use'") (emphasis in original). **Indeed, a contrary view of the word "use" would perversely forbid DOT from helping to preserve the environment in any instance in which a project helps, rather than hurts, the environment.** (Imagine a DOT project planting trees along the edge of a port, or reconstructing a bridge so as to help free an estuary of pollution making it better fit for wildlife.) *Cf. Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978) ("in interpreting the words of a statute," courts have "some scope for adopting a restricted rather than a literal or usual meaning of words where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute").

*Town of Belmont v. Dole,* 766 F.2d 28, 32 (1st Cir.1985) (emphasis added).

Such is the nature of "constructive use" which occurs when the transportation project does not incorporate land from a section 4(f) resource, but the "project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the resource are substantially diminished." 23 C.F.R. § 771.135(p)(2); *see supra* note 10.

In their 4(f) review, Defendants considered the possibility of a constructive use and determined that the possible impacts, including those upon the wetland mitiga-

tion, were not severe, but, rather, were minor intrusions upon the land, and, moreover, did not substantially diminish nor impair the protected lands: the noise level would not exceed the FHWA noise abatement criteria which was considered by the FEIS; the protected land's aesthetics would not be impaired, but eventually would be either shielded or enhanced; there would not be any restriction in access to Stewart State Forrest; there will be no vibration impact; and, any potential ecological intrusion had already been addressed in FEIS but, nevertheless, would not diminish the value of any wildlife habitat, migration or critical life cycle processes. Dkt. No. 102, Ex. 1, Sections V.4 & VIII; *see also* 23 C.F.R. § 771.135(p)(5) (describing what does not constitute constructive use). In fact, FHWA concluded that the impact of the Drury Lane realignment and the wetland mitigation upon the environment was either equivalent to or a reduction of the impacts considered in the FEIS. Dkt. No. 102, Ex. 1, at Section X; *see also* 23 C.F. R. § 771.135(p)(5)(vii) ("Proximity impacts will be mitigated to a condition equivalent to, or better than, that which would occur under a no-build scenario."). While this may seem sophomoric, the Court does not see how elevating a portion of a wetland creates any greater harm than the periodic leveling of the hayfield growing within this area, which has gone unquestioned by the Plaintiffs. We must also remember that this area is essentially a drainage swale, which cannot be aesthetically appealing in its present condition. Any enhancement would certainly be a reasonable and compensatory mitigation for any proximity impact upon it.

■ Plaintiffs' have affidavits from their experts challenging every determination made by the Defendants. But we need to point out that "when specialists express conflicting views, an agency must have dis-

cretion to rely on the reasonable opinions of its qualified experts even if, as an original matter, a court might find contrary views more persuasive." *SPARC I*, 225 F.Supp.2d at 232 (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). It is neither for this Court nor the Plaintiffs to substitute its judgment for that of the experts who conducted the study or the Defendants who relied upon it. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 416, 91 S.Ct. 814; *see also* note 14. We are only obligated to conduct a thorough critique of the Defendants' 4(f) review and guarantee that "neither the methodology employed nor the conclusions reached were arbitrary and capricious." *Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*, 802 F.Supp. 1325, 1336–37 (D.Md.1991).

However, with regard to the wetland mitigation, what confronts this Project is not a use or constructive use of the parklands but rather a temporary use of the lands. A temporary use or occupancy of the parklands

> is so minimal that it does not constitute a use within the meaning of section 4(f) when the following conditions are satisfied:
>
> (i) Duration must be temporary, i.e., less than the time needed for construction of the project, and there should be no change in ownership of the land;
>
> (ii) Scope of the work must be minor, i.e., both the nature and the magnitude of the changes to the section 4(f) resource are minimal;
>
> (iii) There are no anticipated permanent adverse physical impacts, nor will there be interference with the activities or purposes of the resource, on either a temporary or permanent basis;
>
> (iv) The land being used must be fully restored, i.e., the resource must be re-

turned to a condition which is at least as good as that which existed prior to the project; and

(v) There must be documented agreement of the appropriate Federal, State, or local officials having jurisdiction over the resource regarding the above conditions.

23 CFR § 771.135(p)(7).

To address these five conditions of temporary occupancy, the Defendants first note that, overall, there will not be any harm to the protected lands. *SPARC III,* 352 F.3d at 557 (finding that minimal harm will be determined by the Defendants). In conducting their review, the Defendants found, in corresponding order of the above rule and regulation, that

(i) The mitigation construction and spoil disposal will be shorter in duration than the time necessary to construct the road and bridge portions of the project, and there is no change in ownership.

(ii) The Scope of work for the wetlands mitigation is minimal in comparison to the size and nature of the resource. The mitigation and quarry reclamation constitute less than 20 acres of disturbances in the approximately 7,000 acre resource comprised of the Stewart State Forrest and the remaining Stewart Properties, constituting less than 0.3% of the resource.

(iii) There are no anticipated permanent adverse physical impacts. In this case, an active periodically mowed hayfield and an abandoned shale quarry will be converted to a diversified wetland system and an open meadow, affording opportunity for more diverse wildlife and vegetation. Nor will there be interference with the activities or purpose of the resource. NYSDOT's Concurrent Use and Occupancy Agreement with the New York State Department of Environmental Conservation includes condi-

tions for the continued use of the resource.

(iv) The land will be fully restored upon completion of the work to a condition that is better than existed prior to the project. In addition to the approved permitted work, the wetland mitigation and quarry reclamation, the Use and Occupancy Agreement includes conditions to restore the roads to the satisfaction of the NYSDEC.

(v) The NYDSEC, which has jurisdiction of the resource, has approved the wetland mitigation application and, as referenced in the 4(f) Analysis, has entered into an agreement with the NYSDOT for the Concurrent Use and Occupancy of the resource.

Gorton II at ¶ 7; Ex. 1, at Section V.A.

Determining that the temporary occupancy criterion has been met, as stated above, and no harm would be caused to the protected lands, FHWA concluded that the wetland mitigation was not a "use" as contemplated by 23 C.F.R. § 771.135(p)(1).

### 3. Secondary Development as Constructive Use

■ Plaintiffs insist that there is another ground to support the contention that this Project constitutes a constructive use. In essence, Plaintiffs argue, "build it and they will come." The expansion of Drury Lane will, in the Plaintiffs' view, induce commercial growth on the 1,200 acres just east of Drury Lane and in close proximity to Stewart Airport, and in doing so the Defendants have created a constructive use, which would require a 4(f) review. Caffry Aff. at ¶¶ 31–37. This "desperate" argument, speculating about future development, fails on at least three accounts.

■ The Project does not include nor approve any future development of the 1,200 acre parcel, even though there may

have been previous efforts to do so, and the Defendants remonstrate that, at this juncture, there are no future development plans. Gorton II at ¶ 15. This induced development notion was previously considered by this Court and the Second Circuit when both Courts analyzed the related NEPA and SEQRA studies.[17] *SPARC I,* 225 F.Supp.2d at 232–35; *SPARC III,* 352 F.3d at 557–61. In both Courts' views, the Defendants had prevailed in showing that the Project does not approve nor include any future developments and we affirmed the Defendants' environmental review in all respects. Specifically, this Court opined that "any redevelopment of this corridor is too remote to have been included in the FEIS." *SPARC I,* 225 F.Supp.2d at 234. Thus, this issue is controlled by the doctrine of the law of the case, a seminal principle of law. Essentially under this doctrine, any decision made on an issue of law at one stage of a case becomes binding precedent to be followed throughout the litigation. *In re PCH Assoc.,* 949 F.2d 585, 592 (2d Cir.1991) (citations omitted). The Second Circuit concluded that:

> "[T]he doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 815–16, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (dictum)). This doctrine is a discretionary rule of practice and generally does not limit a court's power to reconsider an issue. 1B *Moore's Federal Practice* ¶ 0.404[1], at

120 ("[L]aw of the case is . . . a rule of practice and not a limit on authority."). *Id.* at 592 (typefaces in original).

The underlying considerations for this doctrine are obvious: to maintain fairness to the parties; to maintain consistency throughout the litigation; to avoid reconsideration of matters once decided during the course of the litigation; and to promote judicial economy and societal interest in finality. *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 607 (2d Cir.1999) (a litigant should not be allowed to disregard this doctrine to prejudice the party seeking the benefit of the doctrine); *see also County of Suffolk v. Stone & Webster Eng'g Corp.,* 106 F.3d 1112, 1117 (2d Cir.1997); *Soto–Lopez v. NYC Civil Serv. Comm.,* 840 F.2d 162 (2d Cir.1988).

Moreover, the Plaintiffs' postulation of foreseeable development is an anathema to the rules and regulations, and, indisputably, desultory. The definition of constructive use set forth within 23 C.F.R. § 771.135(p)(2) actually defies this secondary or induced development theory being proffered by the Plaintiffs. *See supra* p. 99 (definition). The regulation is rather pellucid that there must be a "proximate impact" in order to constitute a constructive use. Any hypothetical development would be inapposite to "proximate impact" and, thus, not within the purview of the regulation. And, as the Defendants admit, any future development will potentially be subject to other independent permit reviews and studies. Hence, we agree with the Defendants that the possibility of future development does not amount to a constructive use and no 4(f) review is required on this account.[18] *Laguna Green-*

---

**17.** The relevant statutes are the National Environmental Policy Act (NEPA) and the New York State Environmental Quality Review Act (SEQRA).

**18.** The Plaintiffs concede that there are no reported cases addressing the issues of induced growth as a constructive use of parklands under Section 4(f). Dkt. No. 113, Mem. of Law, at p. 17. Plaintiffs try to bootstrap

*belt, Inc. v. United States Dep't of Transp.,* 42 F.3d 517, 533 (9th Cir.1994) (parklands that are not actually or constructively used for transportation purposes do not trigger a 4(f) review).

Lastly, the Plaintiffs contend that the Defendants failed to give public notice or conduct hearings as required by 23 C.F.R. § 771.135(i). Caffry Aff. at ¶ 16. However, the condition precedent to trigger public notice and then a hearing is a determination that there is a "use" of the protected lands. Here FHWA determined that there is no "use," *a fortiori*, a complete 4(f) review is not warranted, including a public notice and hearings. In some respects, nonetheless, NYSDEC and the CORP held public hearings and received comments before it issued the permit that allows for the wetland mitigation. Dkt. No. 117, Ex. 5; Herberger Aff. at ¶ 6. This should account for some relevant public discourse. To expect another hearing would be duplicative.

## CONCLUSION

The primary objective of Section 4(f) is to avoid highway project impacts upon protected lands and to evaluate feasible and prudent alternatives before using such protected resources. The Defendants are pursuing a prudent and feasible alternative route, the realignment of Drury Lane, which does not **use** the protected parklands, in the context of Section 4(f), and to the extent that it may, they have performed all of the necessary planning to minimize its harm. Since there is no

their argument by referring to NEPA cases which discuss growth-inducing effects. *Id.* But, under our circumstances, the NEPA is-

"use," as defined by 23 C.F.R. § 771.135, the need for a 4(f) review is obviated. However, and contrary to the Plaintiffs' perspective, the Defendants have conducted a 4(f) review arriving at exactly the same conclusions that, under the current proposal, a full blown 4(f) review is unnecessary. Yet, the review performed by the Defendants is thorough and complete, based upon all of the relevant facts, and the determinations made by FHWA are not arbitrary, capricious nor unreasonable, do not constitute an abuse of discretion nor a clear error of judgment, and was conducted in accordance with the law and observing the required procedures. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 416, 91 S.Ct. 814. Further, to this end, the Defendants have complied completely with the directions of the Second Circuit. Defendants have met their obligations.

Therefore, based upon all of the foregoing, it is hereby **Ordered** that the Stay and Injunction, dated November 21, 2002, imposed by this Court is Vacated.

sue has already been decided in the Defendants' favor.